Michael L. WHALEN, Appellant/Cross–Appellee,

v.

John E. CONNELLY, Edward S. Ellers, The Connelly Group, L.P., A Limited Partnership, Della III, Inc., President Riverboat Casinos, Inc., and Klehr, Harrison, Harvey, Branzburg and Ellers, A Partnership, Appellees/Cross–Appellants,

v.

Dennis J. BRITT and Vollertsen & Britt, P.C., Cross–Appellees.

No. 94–1897.

Supreme Court of Iowa.

March 20, 1996.

John R. Perkins of Shearer, Templer, Pingel & Kaplan, P.C., West Des Moines, for appellant and for cross-appellees.

R. Richard Bittner and Jeffrey Bittner of Carlin, Hellstrom & Bittner, Davenport, and W. Stanley Walch and Lawrence C. Friedman of Thompson & Mitchell, St. Louis, Missouri, for appellees.

Considered by HARRIS, P.J., and LARSON, CARTER, SNELL, and ANDREASEN, JJ.

HARRIS, Justice.

The advent of riverboat gambling in Iowa prompted these parties to contract for a business venture. This rather complicated lawsuit is over the extent of the undertaking. The defendants, a Pennsylvania entrepreneur and his enterprises, contend the undertaking was limited to a portion of a Davenport, Iowa, venture. Plaintiff, an Iowa businessman, contends it extended to a portion of all defendants' enterprises. On appeal the question is made a good deal more difficult because it was resolved in district court by way of granting a motion for summary judgment. Because such a motion surrenders all disputed facts, it is a risky way to resolve complex litigation. Nevertheless, like the trial court, we think dismissal of all plaintiffs' claims was correct.

Plaintiff Michael Whalen, the Davenport businessman, believes he is entitled to five percent of the defendant John E. Connelly's gambling enterprises wherever and whenever they materialize. Connelly believes Whalen is entitled to only five percent of a portion of the Davenport gambling development owned by The Connelly Group, L.P. (TCG).

Michael Whalen is a law school graduate who owns and operates a successful restaurant and hotel enterprise in Iowa. John E. Connelly, a resident of Pittsburgh, Pennsylvania, is likewise an accomplished businessman whose interests include a dinner and excursion riverboat operation. The genesis of this controversy occurred in 1987 when the Iowa legislature began considering the legalization of riverboat gambling. Whalen became interested in establishing such an enterprise as a way of expanding his restaurant and hotel business, and he sought out an experienced partner. His quest led him to Connelly, and they discussed potential riverboat gambling in Davenport. When the Iowa legislature authorized riverboat gambling in April 1989, the two utilized Whalen's community ties to quickly promote the passage of a Scott County referendum permitting gambling and later to secure a gaming license for a Davenport riverboat.

Whalen and Connelly's discussions led to extended negotiations which resulted in the formation of TCG, a limited partnership.[1] During these negotiations Connelly and his interests were represented by Klehr, Harrison, Harvey, Branzberg & Ellers, a Philadelphia law firm. Whalen was represented by counsel from Davenport (first by Stephen Jacobs of Betty, Neuman & McMahon and later by Dennis Britt of Vollersten & Britt). Under the terms of a partnership agreement dated December 29, 1989 (the first partnership agreement), and a letter agreement dated March 2, 1990 (the first letter agreement), Whalen became a five percent limited partner; Della III, Inc., a corporation controlled by Connelly, became a general partner; and St. Louis River Cruise Lines, Inc., a Missouri corporation controlled by Connelly, became the other limited partner. Whalen's capital contribution was $5000 and Della III contributed $500,000. Because Whalen and Connelly knew they had insufficient capital and gaming expertise to run a riverboat gambling venture, both contemplated another gaming partner.[2]

TCG subsequently obtained a riverboat gaming license from the Iowa gaming and racing commission subject to adequate financing being in place by April of 1991. Iowa Riverboat Corporation (IRC), a subsidiary of International Gaming Technologies (IGT),[3] became a second general partner in TCG by the terms of an amended (second) partnership agreement dated December 1, 1990. In accordance with the second agreement Connelly entities contributed an additional $5 million in cash, the "President"

1. During the course of these discussions it was agreed that any management services regarding food, beverages, etc. (referred to as hospitality services) provided by Whalen to the partnership would be covered by a separate agreement. In a letter dated November 14, 1989, clarifying the parties' understandings, counsel for Connelly stated:

Any future management services which may be performed by Mr. Whalen or his related entities will be compensated on a separate basis from his equity participation. It is currently contemplated that Mr. Whalen or one of his related entities will have certain management responsibilities in connection with the project and these services will be outlined in a separate management agreement to be negotiated between the development entity and Mr. Whalen. Under no circumstances will Mr. Whalen have the ability to veto any contract which John E. Connelly or one of his affiliates may enter into with the development entity. However, Mr. Whalen may take comfort in the fact that in addition to whatever obligations of fair dealing Mr. Connelly may have under applicable law, any lending institution or equity investor will certainly impose protective standards in this regard for their benefit as well as for the benefit of the development.
It was also agreed that Whalen would receive a 5% interest in the partnership.

2. In order to attract a gaming partner, TCG needed to obtain the previously mentioned riverboat gaming license from the Iowa racing and gaming commission. Time was of the essence, and in order to file an application the commission required submission of a copy of all partnership agreements. See Iowa Admin.Code r. 491–12(1)(b)(4). Whalen and Connelly disagreed concerning the extent of Whalen's 5% share. Whalen desired, not only a 5% equity (profits) interest in the Davenport gaming operations, but also a 5% future interest in Della III's capital account. In other words Whalen wanted a 5% share of the out-of-pocket equity capital contributed by Connelly. He refused to sign the proposed partnership agreement without this provision. Connelly vehemently disagreed, but apparently made the concession in order to preserve the venture because of the time pressures in submitting the license application.

3. IGT is one of the world's largest manufacturers of slot machines and other gambling equipment.

riverboat with a net value of $9.7 million, and a commissary barge with a net value of $800,000. IRC contributed $400,000 in cash and advanced $10 million of subordinated debt. In addition, IGT leased TCG $5 million in gaming equipment. Under the new (second) partnership agreement, IRC received a forty percent interest, Della III acquired a fifty-five percent interest, and Whalen maintained his five percent share.

During this same time Whalen and his attorneys (third-party defendants Vollersten & Britt) and Connelly and his attorneys (the Klehr law firm) were negotiating the effect of the first letter agreement. As a result of these negotiations, the parties executed a second letter agreement dated December 11, 1990, redefining the assets to which Whalen's five percent interest attached and clarifying the priorities for cash distributions.[4]

Riverboat gaming commenced on April 1, 1991. Although business was never sufficiently successful to generate a return on the common equity, it was successful enough to make interest payments on its subordinated debt and preferred capital accounts.[5] It was also sufficiently successful to generate complaints from customers who purchased gaming equipment from IGT, the parent corporation of IRC. As a result, IGT approached Connelly and expressed a desire to "cash out" in order to avoid competing with its customers.

Consequently, in 1992, the parties discussed a proposal to form a new company to be named President Riverboat Casinos, Inc. (PRCI), for the purpose of offering stock to the public. At this time the Missouri legislature was in the process of authorizing a referendum on riverboat gambling. Under the proposal, PRCI would combine TCG with potential gaming operations in Missouri controlled by other Connelly entities.[6]

Whalen was given two options under the initial public offering (IPO). He was first offered the opportunity to purchase a five percent partnership interest in Connelly's Missouri enterprises at a price of $500,000.

---

4. By this time the relationship between Connelly and Whalen had become strained. Edward Ellers, former counsel for Connelly, had recently been hired to serve as chief operating officer of TCG. Whalen sought—to no avail—to clarify his future management role with TCG regarding the provision of hospitality services, first with Ellers and later with Connelly. Whalen's feelings were summed up in a memo he wrote to himself on August 29, 1990:

> Simply a money issue: Michael Whalen has no delusions about his role. There is *no chance* for meaningful involvement—apparently not desired by Connelly anyway.
> a. Fraudulent inducement—re: officer management role
> b. 4% management fee should generate 3 to 4 million—split: 55% Connelly/45% IGT

As previously mentioned, Connelly had located an experienced gaming partner in IRC and negotiated an arrangement to bring it into TCG as a second general partner. IRC's personnel proved to be shrewd negotiators, and as a prerequisite to any affiliation with TCG, they made several demands. Among these was an insistence that Connelly or his entities make the additional $5 million cash infusion.

This time Connelly had the tactical advantage. The additional contribution had not been contemplated by the parties under the first partnership agreement, and Connelly refused to go forward unless Whalen waived his 5% interest on the additional $5 million cash infusion. Whalen ultimately acquiesced, claiming he did so as a gesture of good faith to keep the partnership alive and in reliance (as claimed in his brief)—or hope (as indicated by his testimony at trial)—that Connelly would grant him the hospitality contract. At the instance of IRC however, the second partnership agreement also contained a provision (§ 8.1) requiring all operating officers of the partnership to be full time employees. This provision effectively eliminated Whalen from consideration for the vice president of food and beverage position he desired due to his extensive outside business interests. Whalen had knowledge of this provision but nevertheless believed something could be worked out.

5. Under the terms of the second partnership agreement and second letter agreement, Whalen was entitled to receive 5% of the interest the Connelly affiliates received on their $18.5 million in capital accounts (preferred and common). At the end of the calendar year 1991, TCG paid a return on the Connelly entities preferred capital. Della III paid Whalen his share of the distribution (approximately $43,000) under the second letter agreement. Whalen accepted this payment without objection.

6. TCG Missouri owned cruise boats and riverboat docking leases in St. Louis, and was identified as a general partnership between IGT and Connelly entities in the second partnership agreement. IC Admiral Partners was a sister partnership between Connelly and IGT entities that owned the Admiral, a large entertainment vessel moored on the St. Louis riverfront.

This would have entitled Whalen to five percent of the total number of shares of PRCI allocated to all the other partners in conjunction with the IPO. Whalen took the position that he would pay the $500,000, but wanted his shares to be sold to the public in the IPO. This way he could "cash out" the same as IGT could. This request was rejected by the underwriters due to adverse tax consequences and also because it would give the appearance that the original investors were "bailing out" if any partner other than IRC were a selling shareholder.

Whalen's second option was to make no additional investment, but then receive only two-and-one-half percent of the total number of shares of PRCI due to the relatively equal value of TCG and the Missouri partnerships. Because Whalen disputed this valuation he declined the option. In the event both options were declined, Whalen was informed the other partners in TCG would transfer their partnership interests (as permitted under section 10 of the second partnership agreement) to PRCI after the IPO, leaving TCG intact.

The IPO eventually went forward under this third alternative. TCG transferred' its partnership interests to PRCI. Della III and the other two Connelly affiliated partners in TCG received a cash distribution on December 18, 1992, of $1,230,769 and received 1,118,091 unregistered shares of PRCI. On February 4, 1993, TCG tendered to Whalen $61,538.45 in cash and 55,904 shares of PRCI unregistered common stock (which later split twice and is now represented by 167,712 shares of unregistered common stock).

Whalen filed this suit three months later alleging breaches of oral and written agreements, breach of fiduciary duties, negligent and fraudulent misrepresentation, intentional interference with prospective business advantage and contract, promissory estoppel, unjust enrichment, constructive trust, civil conspiracy, and securities law violations. Whalen claimed he had been wrongfully denied a management role involving the hospitality services related to the gambling venture in Iowa and the expansion rights to Connelly's gambling enterprises in other jur-

isdictions. The defendants counterclaimed, alleging Whalen breached oral and written contracts and fiduciary duties. The district court granted summary judgment against Whalen on the negligent misrepresentation, promissory estoppel, breach of written contract, civil conspiracy, and intentional interference with prospective business advantage and contract claims. Summary judgment was also granted against Connelly on the counterclaims. The rest of the claims went to trial, but were eventually dismissed on the defendants' motion for a directed verdict. The district court then entered a declaratory judgment that the cash and PRCI stock offered on February 4, 1993, constituted full compliance with the terms of the parties' agreement.

Whalen appeals and the defendants cross-appeal.

■ I. Whalen first assigns error in the grant of summary judgment on his breach of contract claim. When reviewing a summary judgment ruling, we determine whether a genuine issue of material fact exists and if the law was correctly applied. *Ottumwa Hous. Auth. v. State Farm Fire & Cas. Co.*, 495 N.W.2d 723, 726 (Iowa 1993).

Whalen contends the defendants breached the partnership agreements in two ways. He first argues the defendants denied him his right to invest in the expansion of riverboat gambling outside Iowa. To answer the question, we first consider whether the partnership agreements and letter agreements constituted fully integrated contracts.

■ An agreement is fully integrated when the parties involved adopt a writing or writings as the final and complete expression of the agreement. *Montgomery Properties Corp. v. Economy Forms Corp.*, 305 N.W.2d 470, 476 (Iowa 1981). Whether or not a written agreement is integrated is a question of fact to be determined by the totality of the evidence. *See* Restatement (Second) of Contracts § 209, cmt. c (1981). When an agreement is deemed fully integrated, the parol evidence rule prevents the receipt of any extrinsic evidence to contradict (or even supplement) the terms of the written agreement.

Restatement (Second) of Contracts § 213 (1981).

■ The parol evidence rule applies only to prior and contemporaneous matters; it does not bar evidence of subsequent negotiations to show modification of a written contract. *Baie v. Nordstrom*, 238 Iowa 866, 869, 29 N.W.2d 211, 213 (1947). A written contract can be amended by oral agreement and a provision in a written contract that it can be modified or rescinded *only* in writing is ineffective (subject, of course, to the doctrine of consideration and the statute of frauds). *See* Restatement (Second) of Contracts § 283 cmt. b (1981); E.A. Farnsworth, *Contracts* § 7.6, at 492–93 (2d ed. 1990).

■ We have held the parol evidence rule applies where a "handcrafted contract contains an integration clause, where the parties were sophisticated business persons represented by counsel and of equal bargaining strength, and where terms of the alleged oral agreement reasonably would be expected to be included in the … agreement." *Montgomery*, 305 N.W.2d at 476. This rule applies to the present case. The partnership agreements were clearly handcrafted documents and both partnership agreements contained an integration clause (section 17.7 in both). Whalen and Connelly were successful businessmen separately represented by counsel. The parties negotiated at arm's length, as evidenced by Whalen's ability to gain the out-of-pocket capital concession from Connelly. We conclude there are no facts in dispute which could lead a reasonable person to find the agreements were not fully integrated.

■ Our next task is to construe the terms of the agreements. In section 17.3 of both partnership agreements, the parties agreed to be governed by Delaware law. It is the cardinal rule of construction that the intent of the parties must control and this intent must be ascertained from the language of the agreement. *Citadel Holding Co. v. Roven*, 603 A.2d 818, 822 (Del.1992). Collateral agreements may be considered only to determine the meaning of ambiguities. *Id.*

There are three pertinent provisions of the second partnership agreement regarding expansion rights. Section 3, which details the purposes of the partnership, states:

In addition, it is the intent of the partnership to investigate other riverboat gaming opportunities in the United States. The general partners, by unanimous consent, are authorized to expand the partnership's activities into other jurisdictions other than Davenport, Iowa, by means of direct operations, organization of new partnerships or corporations or by means of joint ventures and to acquire such other vessels, realty and personalty as they shall deem desirable to the conduct of such operations.

In turn, section 5.10 provides:

In the event the general partners unanimously determine to expand the operations of the partnership into jurisdictions other than Davenport, Iowa and additional capital is required in connection with such expansion, each partner owning an interest shall be given an opportunity to invest an amount in proportion to his interest of the additional capital required by the partnership, on substantially equal terms, with each other partner. If a partner declines to make such investment, his interest shall be diluted in a manner which will be set forth in the written notice conveying the right to invest and maintain his interest.

Finally, section 8.6 responds:

The general partner shall devote to the partnership such time as it, in its sole discretion, may deem necessary for the proper performance of its duties hereunder, but neither the general partner nor any of its affiliates shall be expected to devote their full time to the performance of such duties. The general partner and its affiliates may act as general or managing partners for other partnerships or ventures engaged in businesses similar to those conducted hereunder even if competitive with the businesses of the partnership. The general partner and its affiliates shall not incur any obligation, fiduciary or otherwise, to disclose, grant or offer any interest in such activities to any party hereto, except as specifically provided for herein, and shall not be deemed to have a conflict of interest because of such activities.

■ The meaning of these provisions is clear and unambiguous. Sections 3 and 5.10 grant the partnership *authority* to expand business to other states. On the other hand, section 8.6 allows any general partner or "affiliate" to engage in such ventures anywhere without offering the opportunity to either the partnership or the other partners. "Affiliate" is defined in the glossary section of the agreement as any "person" who directly or indirectly controls any other corporation or partnership. For example, Connelly is an affiliate of Della III. The limitation contained in section 8.6 is permissible under Delaware partnership law.[7] We conclude it would be no breach of the partnership agreement for Della III (a general partner) or Connelly (an affiliate) to engage in riverboat gambling projects in other states without offering Whalen (a limited partner) the opportunity to participate.[8] Any contention to the contrary is without merit.

■ Whalen also asserts the partnership agreement was breached by a management fee charged to TCG by the general partners. He claims the general partners did nothing to earn this fee and the fee was merely a sham to siphon profits away from him. To the contrary, the management fee arrangement was expressly authorized in section 8.5 of the second partnership agreement:

> (a) The partnership shall enter into a management advisory agreement in the form attached hereto as exhibit "D", pursuant to which a four percent fee will be paid to the general partners for services to be rendered by them to the partnership.

Thus Whalen's second claim of breach of contract is also without merit.[9]

■ The terms of the partnership agreement were clear and unambiguous, and Whalen raises no genuine issue of material fact regarding their meaning. The district court issued a declaratory judgment finding the $61,531.45 in cash and 55,904 shares of PRCI offered to Whalen on February 3, 1993, to be full satisfaction of the defendants' obligations under the partnership and letter agreements. We agree with these findings and reject the first assignment of error.

■ II. Whalen's second assignment assails the trial court's grant of summary judgment on his claims of breach of fiduciary duty against Della III. As in his breach-of-the-partnership-agreement claim, Whalen alleges Della III breached its fiduciary duty to him by (1) denying him expansion rights and (2) diversion and/or dilution of partnership assets through the management fee arrangement. Whalen's specific assertion is that the general partnership did nothing to earn the fee and used its employees in Connelly's Missouri enterprises without compensation to the partnership. With regard to Whalen's first allegation, the district court found that, because the partnership agreement had not been breached, there could be no breach of any fiduciary duty. For the reasons already explained in division I, we agree.

■ The district court correctly characterized Whalen's second allegation as a claim that the general partners were mismanaging the partnership and wasting partnership assets. The claim is derivative in nature because Whalen was not injured "directly or independently" of the partnership. *Litman v. Prudential–Bache Properties*, 611 A.2d 12, 15–16 (Del.Ch.1992) (finding derivative a claim that the general partners put

7. Delaware law provides:
   (c) It is the policy of this chapter to give maximum effect to the principle of freedom of contract and to the enforceability of partnership agreements.
   (d) To the extent, that at law or in equity, a partner has duties (including fiduciary duties) and liabilities relating thereto to a limited partnership or to another partner, (1) any such partner or other person acting under a partnership agreement shall not be liable to the limited partnership or to any such other partner for the partner's or other person's good-faith reliance on the provisions of such partnership agreement, and (2) the partner's or other person's duties and liabilities may be expanded or restricted by provisions of the partnership agreement.
   Del.Code Ann. tit. 6 § 17–1101 (1995).

8. This conclusion is strengthened by the fact that Connelly gave Whalen a chance to participate in his Missouri gaming ventures.

9. Because they involve derivative claims of the partnership, other aspects of this assignment are discussed in division II.

their interests above those of the limited partners, resulting in decreased income to the partnership). When a claim against a partnership is derivative, Delaware law requires the plaintiff to either make a demand on the general partners to instigate litigation or plead an explanation of why such a demand was not made. *Id.* at 17; *see also* Del.Code Ann. tit. 6 §§ 17–1001, 1003 (Supp. 1990). Whalen failed to make a demand and also failed to plead anything explaining his failure to do so. He thereby failed to meet the requirements of Delaware law, and thus lacked standing to bring this claim.

Whalen did request leave to amend his petition, but this request was denied by the district court because IRC had already made a similar demand with satisfactory results. A trial court has considerable discretion in ruling on a motion for leave to amend, and we reverse only on a clear abuse of discretion. *Allison–Kesley Ag Ctr. v. Hildebrand,* 485 N.W.2d 841, 846 (Iowa 1992). Under these facts, and recognizing that the motion was made shortly before trial, we cannot say the district court abused its discretion. The second assignment is without merit.

III. For his third assignment Whalen contends the district court erred in granting a directed verdict against his claim that Connelly breached an oral agreement and breached corresponding fiduciary duties. On review of such a ruling we determine whether the plaintiff presented substantial evidence on each element of the claim. *Swanson v. McGraw,* 447 N.W.2d 541, 542 (Iowa 1989). We view the evidence presented in a light most favorable to the party against whom the motion is directed, and if reasonable minds could differ on an issue then the court must submit the issue to the jury. *Id.* at 543; Iowa R.App.P. 14(f)(2).

Whalen contends he had an oral partnership agreement with Connelly to manage the provision of food and beverage services on the President Riverboat Casino and any related hotel facility, and that he and Connelly would together expand their enterprise into other jurisdictions that legalized riverboat gambling. This claim asserts the existence of an oral partnership between the two. The elements of an oral partnership are (1) an intent by the parties to associate as partners, (2) an agreed business, (3) earning of profits, and (4) co-ownership of profits, property, and control. *Chariton Feed & Grain, Inc. v. Harder,* 369 N.W.2d 777, 785 (Iowa 1985).

Events that unquestionably occurred thereafter contradict Whalen's claim of oral partnership. Shortly after the dates of the alleged oral agreement, Whalen hired counsel to formalize his contract with Connelly regarding their partnership involving a riverboat gambling venture, entered into a written contract with Connelly and his entities which covered the precise subject matter of the alleged oral agreement, and this written contract contained a plainly visible integration clause. Whalen's claim of a separate oral partnership is untenable because the written contract must be viewed as superseding any prior oral agreement by application of the integration clause and the parol-evidence rule.

Whalen's claim regarding an oral contract for the provision of hospitality services does warrant further discussion. As he points out, the November 1989 letter from Connelly's counsel contemplated he would have some sort of management role in the future. A contract is however generally not found to exist when the parties agree to a contract on a basis to be settled in the future. *Air Host Cedar Rapids v. Airport Comm'n,* 464 N.W.2d 450, 453 (Iowa 1990). In other words an agreement to agree is not a contract. Because Whalen did not produce substantial evidence concerning definitive terms of an agreement to provide hospitality services, we cannot say that the jury reasonably could have considered that a meeting of the minds had occurred. *See id.;* Restatement (Second) of Contracts § 33 (1981). We therefore reject the challenge to the district court's grant of a directed verdict on the issue of breach of an oral contract and corresponding fiduciary duties.

IV. Whalen's fourth assignment complains of a district court grant of summary judgment for Ellers, TCG, and Della

III and in granting a directed verdict for Connelly on the ground that Whalen waived his claims of fraudulent misrepresentation by entering into the second partnership agreement. Whalen argues he was fraudulently induced to enter into the partnership and letter agreements by defendant's promises to him regarding the extent of his "five percent of the deal," a management position in the Davenport operation, and expansion rights. The details surrounding these alleged inducements have been previously discussed. To make out this claim, Whalen must establish the following elements by clear and convincing evidence: (1) representation; (2) falsity; (3) materiality; (4) scienter; (5) intent to deceive; (6) reliance; and (7) resulting injury and damage. *Robinson v. Perpetual Serv. Corp.*, 412 N.W.2d 562, 565 (Iowa 1987).

■ Whalen cannot establish these elements for two reasons. In the first place all of the alleged representations involved matters that were specifically addressed in the integrated written partnership agreements and corresponding letter agreements. Although we have allowed fraudulent inducement claims to proceed despite an integration clause in a contract, we have done so only with regard to misrepresentations concerning facts or circumstances not included in the written contract. *See Robinson*, 412 N.W.2d at 567 (fine print, boiler plate provision not intended to encompass assurances made to persuade signing of the contract); *Hall v. Crow*, 240 Iowa 81, 87–88, 34 N.W.2d 195, 199 (1948). Such is not the case here. To allow Whalen to proceed would vitiate the parol-evidence rule.

■ We also think Whalen must be viewed as having disaffirmed any claim of fraudulent inducement. His August 29, 1990, memo detailing his mounting frustrations with Connelly flatly contradicts any such claim. Whalen noted the belief that he had a potential fraud claim concerning his unacquired management role. He made this observation prior to his execution of the second partnership agreement. When a person with knowledge of a potential fraud enters into a new agreement concerning the same subject matter, he waives his claim to fraud in the original transaction. 37 C.J.S. *Fraud* § 69

(1943). The district court's dismissal of all of Whalen's claims based on fraud was correct.

■ V. Whalen's fifth assignment challenges a district court finding that he lacked standing to bring his securities claim and that his claims were barred by the statute of limitations. Iowa Code section 502.401 (1993) states "it is unlawful for any person, in connection with the offer to sell, offer to purchase, sale or purchase of any security in this state, directly or indirectly" to make fraudulent misrepresentations. *See also* Iowa Code § 502.502 (granting a private cause of action to enforce this section). A limited partnership interest is considered a "security" for purposes of the statute. *Corporate East Assoc. v. Meester*, 442 N.W.2d 105, 107–08 (Iowa 1989). Whalen claims a violation of Iowa Code section 502.401 at each of the three stages of the gambling venture's development: (1) the first partnership and letter agreement; (2) the second partnership and letter agreement; and (3) the creation of PRCI and the IPO.

■ Even if we were to assume the existence of fraud, Whalen's claims asserting the first two stages would still fail because they are time barred. Iowa Code section 502.504(2) requires that a securities fraud enforcement action must be brought within the shorter of (1) five years after the act or transaction concerning the violation or (2) two years after notice of the violation. The district court correctly concluded Whalen's testimony indicated he knew of the alleged misrepresentations prior to the signing of the second partnership agreement in December of 1990. In his August 29, 1990, memo he also demonstrated he knew of alleged misrepresentations. Because Whalen did not bring this suit until May of 1993 the statute of limitations bars any claims regarding the first two stages of the gambling partnership.

■ Whalen also alleges a securities violation at the third stage when he was offered an interest in the Missouri gambling enterprises. He claims he was misled regarding whether he could sell the unregistered shares of stock in PRCI in less than two years after the IPO. This claim fails, as a matter of law, because Whalen never actually bought into

the Missouri partnership by purchasing the shares. Iowa Code section 502.502, the provision creating a cause of action for violation of section 502.401, expressly states the violator "shall be liable to the purchaser." Bystanders have no standing to sue. In the absence of such an interpretation,

> bystanders to the securities marketing process could await developments on the sidelines without risk, claiming that inaccuracies in disclosure caused nonselling in a falling market and that unduly pessimistic predictions by the issuer followed by a rising market caused them to allow retrospectively golden opportunities to pass.

*Blue Chip Stamps v. Manor Drug Stores,* 421 U.S. 723, 747, 95 S.Ct. 1917, 1931, 44 L.Ed.2d 539, 556 (1975) (commenting on the rationale for the federal rule); *Watts v. Des Moines Register & Tribune,* 525 F.Supp. 1311, 1318–19 (S.D.Iowa 1981) (noting the Iowa law mirrors the federal rule). Thus Whalen's securities claims were properly dismissed. We find no merit in the assignment.

■ VI. Whalen's sixth assignment assails a district court ruling dismissing all claims against the Klehr law firm (of which Ellers was a member) for lack of personal jurisdiction under the fiduciary-shield doctrine. We adopted the fiduciary-shield doctrine in *State ex rel. Miller v. Internal Energy Management Corp.,* 324 N.W.2d 707, 710–11 (Iowa 1982), as a due-process limitation on our exercise of jurisdiction. According to the doctrine a nonresident corporate agent is not individually subject to the forum state's in personam jurisdiction if that individual's only contact with the state is by virtue of his acts as a fiduciary of the corporation. *Id.* at 711–12.

Whalen argues this doctrine was implicitly rejected by the United States Supreme Court in *Calder v. Jones,* 465 U.S. 783, 104 S.Ct. 1482, 79 L.Ed.2d 804 (1984). *Calder* was a libel suit by a California resident against an editor and a reporter of a tabloid newspaper who were both Florida residents. The suit involved an article that was published in the newspaper which was circulated in California. On the issue of personal jurisdiction, the court noted:

> Petitioners are correct that their contacts with California are not to be judged according to their employer's activities there. On the other hand, their status as employees does not somehow insulate them from jurisdiction. Each defendant's contacts with the forum state must be assessed individually.

*Id.* at 790, 104 S.Ct. at 1487, 79 L.Ed.2d at 813. The court found there was jurisdiction after noting that California's "long arm" statute permits assertion of jurisdiction over a nonresident defendant to the extent permitted by the federal constitution. *Id.* at 786 n. 5, 104 S.Ct. at 1485 n. 5, 79 L.Ed.2d at 810 n. 5.

■ Although *Calder* can be viewed as authorizing personal jurisdiction in the present case under federal due-process principles, it does not *mandate* personal jurisdiction as a due-process right. Indeed we reaffirmed the validity of the fiduciary-shield doctrine in *State ex rel. Miller v. Baxter Chrysler Plymouth, Inc.,* 456 N.W.2d 371, 378 (Iowa 1990), a post-*Calder* case. Because we think the doctrine applies here, we agree with the trial court's dismissal of the counts against the Klehr law firm for lack of personal jurisdiction.

■ VII. Whalen's final assignment is based on his belief that genuine issues of material fact existed with regard to whether he was represented by the Klehr law firm before entering the written agreements. Thus he claims breach of fiduciary duties against Ellers and the Klehr law firm. Under Iowa law three elements must be shown to establish an attorney-client relationship: (1) the person claiming a breach of the relationship has sought the advice or the assistance of the attorney; (2) the advice or assistance pertain to a matter within the attorney's competence; and (3) the attorney expressly or impliedly agreed to give or actually gave desired advice or assistance. *Kurtenbach v. TeKippe,* 260 N.W.2d 53, 56 (Iowa 1977).

■ Whalen argues that, prior to the formation of TCG, the Klehr firm's client was the unincorporated association of Whalen and Connelly. An examination of the record

however refutes this assertion. As stated by the district court:

> [Klehr] has represented John E. Connelly and his business since 1984. [Klehr's] principal office is in Philadelphia, Pennsylvania. None of its attorneys or partners are licensed to practice in the State of Iowa. All of [Klehr's] time spent on the Davenport, Iowa, riverboat gaming project was billed to J. Edward Connelly and Associates, a wholly owned corporation of John E. Connelly. All the time records of [Klehr] showed J. Edward Connelly and Associates as the client. No fees were ever billed by [Klehr] to Michael Whalen. Michael Whalen had no written engagement letter or contract with [Klehr] to represent him. Plaintiff never paid any fees to [Klehr] for legal services. The plaintiff never reimbursed John E. Connelly or any of his business affiliated entities for any attorney's fees charged by [Klehr]. From approximately October, 1989, Michael Whalen was represented by either Steven Jacobs or Dennis Britt. . . .

There was no error in the ruling.

VIII. Defendants' cross-appeal was conditional, to be considered only if we found merit in any of the assignments in plaintiffs' appeal. Because we have not, the cross-appeal is moot.

**AFFIRMED.**