# United States Court of Appeals
## FOR THE EIGHTH CIRCUIT

———————

No. 05-3592

———————

Charles Cagin,                     *
                                   *
            Appellant,             *
                                   *   Appeal from the United States
      v.                           *   District Court for the
                                   *   Southern District of Iowa.
The McFarland Clinic, P.C.,        *
                                   *
            Appellee.              *

———————

Submitted: April 20, 2006
Filed: July 31, 2006

———————

Before ARNOLD and COLLOTON, Circuit Judges, and BOGUE,[1] District Judge.

———————

BOGUE, District Judge.

Dr. Charles Cagin ("Cagin") appeals the district court's[2] adverse grant of summary judgment in his breach of contract action against The McFarland Clinic (the "Clinic"). Cagin argues the district court erred (1) in finding no material fact questions existed regarding the Clinic's alleged breach of an employment contract,

———————

[1]The Honorable Andrew W. Bogue, United States District Judge for the District of South Dakota, sitting by designation.

[2]The Honorable Thomas J. Shields, Chief United States Magistrate Judge for the Southern District of Iowa, to whom the case was referred for final disposition by consent of the parties pursuant to 28 U.S.C. § 636(c).

and (2) in concluding that extrinsic evidence should not be admitted to aid in interpreting the employment contract. We affirm.

## FACTUAL AND PROCEDURAL BACKGROUND

Cagin was an interventional cardiologist in solo practice in Des Moines, Iowa. The Clinic was a multi-specialty medical clinic located in Ames, Iowa. In 1999, Cagin began negotiating with Dale Anderson, Chief Executive Officer of the Clinic, regarding Cagin joining the Clinic as a cardiologist in an office the Clinic was opening in Des Moines. Cagin understood that as the first cardiologist hired, he would be the only physician in the Cardiology Department when he started. Cagin estimated he would be working as the only cardiologist in the department for six to eighteen months. Cagin was told that, if he joined the Clinic's Des Moines office, he would receive sufficient backup and call coverage from other cardiologists the Clinic would hire in the Des Moines area.

The parties entered a three-year employment agreement (the Agreement) on January 10, 2000, and Cagin soon began working for the Clinic. Under the Agreement, Cagin was entitled to six weeks of vacation and two weeks of professional meeting time per year. Vacation and professional meeting time could not be carried forward. The Clinic did not keep track of vacation or professional meeting time for physicians and did not pay for vacation or professional meeting time a physician did not take. Cagin received a Physician Policy Manual ("Manual"), which was incorporated into the Agreement. The Manual set out a physicians compensation plan, holiday schedule, fringe benefits, provided that Clinic physicians were entitled to seven holidays per year, and provided they would work a minimum of four and one-half days per week. Cagin testified in his deposition that he understood that the policy stated that if he were in a department with only one physician, he would be responsible for all call coverage. The Agreement did not provide that the Clinic would furnish call coverage for Cagin by any particular date, or that Cagin would be provided with any particular level of call coverage. After negotiations regarding

Cagin's salary and the length of the Agreement, during which Cagin was represented by counsel, the parties agreed that a salary of $275,000 per year would compensate Cagin for cardiological services, call coverage time, and time spent on vacation and in continuing medical education meetings. Cagin could earn more than the $275,000 guaranteed salary, under the Clinic's "Compensation Plan for Physicians" if he exceeded certain annual production goals. The $275,000 salary was guaranteed for three years, after which Cagin's compensation was to be "as determined by the Board of [the Clinic]." The Agreement contained an integration clause, which provided that it was the entire agreement between the parties, superceding all negotiations, prior and contemporaneous discussions, preliminary agreements, and understandings of the parties as to the subject matters of the Agreement. The Agreement also provided that any modification thereto must be in writing.

Cagin worked for the Clinic from January 2000 to August 2003. In July 2000, Dr. Narish Solankhi ("Solankhi") joined the Clinic Cardiology Department, practicing in Ames and performing interventional cardiologic procedures in Des Moines. In September 2001, Dr. Charles Laham ("Laham") began working in the Cardiology Department in the same office as Cagin in Des Moines. Cagin later became displeased with the amount of call coverage he received from Solankhi and Laham.

From 2000 to 2002, Cagin's salary exceeded his guaranteed salary of $275,000. In July 2002, the Clinic decided to change its compensation system for the next year. Under the new system in 2003, Cagin, by then a shareholder of the Clinic, earned less than he had under the terms of the Agreement. Cagin never complained to the Clinic's board of directors about his workload or call coverage, and never requested a reduced call requirement from the Clinic's board. Although Cagin claims he worked "24/7" during his time with the Clinic, this was shown to be an exaggeration during his deposition, when Cagin stated he took six weeks of vacation during that time. Cagin also admitted he took adequate time off for professional meetings to keep his medical license. Cagin did complain verbally about vacation time and backup and call

coverage to Roger Kluesner, the Clinic's Chief Operating Officer, and Joyce Lee, a registered nurse who was administrative head of the Cardiology Department.

Cagin resigned from the Clinic in August 2003. Cagin left the Clinic because he felt mistreated by the Clinic; because his 2003 income was well below his previous annual salaries, largely due to a new formula that changed the way overhead expenses were assigned; because he had worked "24/7" for three years without a vacation; and because the Clinic did not provide him with adequate backup and call coverage.

Cagin filed suit against the Clinic on February 5, 2004, alleging breach of the Agreement and violations of the Iowa Wage Payment Collections Act,[3] and seeking punitive damages. In granting summary judgment to the Clinic, the district court opined that "this case is about Cagin's 'hindsight' regret that he did not avail himself of the full benefits allowed under the Agreement." The district court "believe[d] that Cagin has only himself to blame for his failure to take a full six weeks of vacation each year; to attend continuing medical education programs for up to ten days per year[;] and to not work holidays." The court ruled Cagin was paid as much as he was promised in the years 2000, 2001, and 2002, regardless of whether he took six weeks of vacation, worked every holiday, or took less than ten days allowed for medical education. The court noted the Clinic did not maintain records for physicians concerning how much time they took out of the office on a yearly basis. Cagin also kept no such records. The Clinic had a "use it or lose it" policy with regard to leave, and "only Cagin knew how much time he was entitled to be gone, and more importantly, how much time he actually took." In sum, the district court concluded Cagin had been paid the full salary to which he was entitled, and no evidence showed the Clinic breached the Agreement.

---

[3]Cagin has not presented any argument regarding the Iowa Wage Payment Collections Act. Thus, he is deemed to have abandoned this argument on appeal. See Geach v. Chertoff, 444 F.3d 940, 946 n.7 (8th Cir. 2006).

DISCUSSION

Iowa law determines the rights of the parties in this diversity action. R&B Appliance Parts, Inc. v. Amana Co., L.P., 258 F.3d 783, 786 (8th Cir. 2001). We review de novo both the district court's interpretation of Iowa law, as well as the grant of summary judgment. Ehlis v. Shire Richwood, Inc., 367 F.3d 1013, 1015-16 (8th Cir. 2004).

A.    Material Factual Disputes

Cagin first contends there were material factual disputes in this case that precluded summary judgment for the Clinic. Cagin asserts he worked "24/7" and was unable to take professional meeting time, vacations, weekends, or holidays off as provided in the Agreement. Due to "inadequate back up and call coverage," Cagin states, "he was effectively denied these benefits which he had bargained for." Further, although the vacation and other time off were calculated into his guaranteed compensation, Cagin argues he is "still 'out' the taking of the actual time off so that he could spend it with his family and at leisure." The Clinic responds, arguing it was Cagin's "responsibility to cover the patients he treated in order to take personal time off from work." Cagin's claims, it argues, "stem from the fact that he became angry about the length of time it took the Clinic to recruit other physicians" to his department and "about the quantity of coverage he received from the two physicians that were recruited." Further, the Clinic contends, Cagin could have negotiated for a timetable as to the recruitment of physicians in his department or as to the amount of his call coverage.

Under Iowa law, "[i]n a breach-of-contract claim, the complaining party must prove: (1) the existence of a contract; (2) the terms and conditions of the contract; (3) that it has performed all the terms and conditions required under the contract; (4) the defendant's breach of the contract in some particular way; and (5) that plaintiff has suffered damages as a result of the breach." Molo Oil Co. v. River City Ford Truck Sales, Inc., 578 N.W.2d 222, 224 (Iowa 1998). "A party breaches a contract when,

without legal excuse, it fails to perform any promise which forms a whole or a part of the contract." Id.

The district court noted that the parties agree the Agreement is valid, and the terms of the contract are contained in the Agreement and incorporated Manual. The parties also agree that Cagin has fully performed under the Agreement. Thus, the first issue before the court is whether Cagin has shown a genuine issue of material fact as to whether the Clinic breached the Agreement in some way.

As the district court observed, while factual disputes may exist in this case, none of these disputes are material to the issue presented. The Agreement provided that Cagin was to receive six weeks of vacation, two weeks for professional training meetings, and seven holidays per year, but the vacation and professional training time could not be carried forward. Cagin was responsible for tracking the time he took for vacation and professional training. Cagin also was responsible for covering the patients he treated in order to take this time off from work. Cagin repeatedly insists the Clinic failed to provide backup and call coverage, in breach of the terms of the Agreement. However, Cagin has not pointed to any provision in the Agreement requiring the Clinic to do so.

The Clinic paid Cagin according to the terms of the Agreement in the years 2000, 2001, and 2002. Cagin has not presented evidence that the Clinic failed to provide vacation or other time off work. Cagin did not document the alleged denials of his contractual rights to take this time off. Further, Cagin claims the Clinic was required to hire other cardiologists. Cagin goes so far as to contend that these cardiologists were required to *reside* in Des Moines. This residency requirement, in our view, is a transparent attempt to create a factual issue to rebut the fact that the Clinic recruited and hired two other cardiologists, in accordance with the Agreement. In fact, Laham actually worked in the Des Moines office with Cagin, and merely resided in Ankeny, Iowa. Furthermore, notwithstanding Cagin's claim of breach due

to the length of time it took to hire these cardiologists and the fact they were not in Des Moines, nothing in the Agreement required the Clinic to hire them within a certain time frame, nor that they reside in Des Moines. In sum, Cagin has not presented evidence to create a factual dispute as to whether the Clinic breached the Agreement.

B.    Extrinsic Evidence

Cagin also argues that the district court erred in concluding that extrinsic evidence would not be used to aid in the interpretation of the Agreement. Specifically, Cagin contends the court should have considered as extrinsic evidence the alleged representations made by Clinic administrators during contract negotiations leading up to the signing of the Agreement. The extrinsic evidence Cagin claims should have been considered relates to his understanding about which party (Cagin or the Clinic) would be responsible for backup and call coverage.

The Agreement contains an integration clause, which states that the Agreement constitutes the entire agreement of the parties and supercedes all previous negotiations and discussions on the subject matters contained in the Agreement. Under Iowa law, "[a]n agreement is fully integrated when the parties involved adopt a writing or writings as the final and complete expression of the agreement." Whalen v. Connelly, 545 N.W.2d 284, 290 (Iowa 1996). "When an agreement is deemed fully integrated, the parol evidence rule prevents the receipt of any extrinsic evidence to contradict (or even supplement) the terms of the written agreement." Id. "Whether or not a written agreement is integrated is a question of fact to be determined by the totality of the evidence." Id.

The Iowa Supreme Court has held the parol evidence rule applies to exclude such evidence when a "handcrafted contract contains an integration clause, where the parties were sophisticated business persons represented by counsel and of equal bargaining strength, and where terms of the alleged oral agreement reasonably would

be expected to be included in the . . . agreement." <u>Montgomery Props. Corp. v. Econ. Forms Corp.</u>, 305 N.W.2d 470, 476 (Iowa 1981). This rule applies in the instant case. The Agreement was a handcrafted document, not a form document using boilerplate language. <u>Compare</u> <u>id.</u> (applying parol evidence rule to "handcrafted" document), <u>with</u> <u>Levien Leasing Co. v. Dickey Co.</u>, 380 N.W.2d 748, 752-53 (Iowa Ct. App. 1985) (distinguishing <u>Montgomery Properties Corp.</u>, in a case where the integration clause was contained in a boilerplate, rather than handcrafted, motor vehicle lease). The Agreement contained a clear and unambiguous integration clause. The Clinic is a business and Cagin was a successful physician. Both parties were represented by counsel during lengthy negotiations on the Agreement. The parties negotiated at arm's length, as demonstrated by Cagin's ability to negotiate a higher annual salary and an additional year of guaranteed salary, neither of which were originally proposed by the Clinic. <u>See</u> <u>Whalen</u>, 545 N.W.2d at 291.

Had Cagin desired provisions in the Agreement regarding backup and call coverage, he should have requested the same. But Cagin did not do so. Neither the Agreement nor the Manual contains any provision requiring backup and call coverage. The Agreement does, however, contain the integration clause, stating that it supercedes all negotiations preceding it. Cagin has not adduced any evidence to suggest the Agreement did not constitute the final expression of the parties' agreement. Accordingly, we conclude there are no facts in dispute which could lead a reasonable person to find the Agreement was not fully integrated. The parol evidence rule bars introduction of extrinsic evidence to modify the terms of the Agreement. <u>See</u> <u>id.</u>

## CONCLUSION

Cagin was compensated according to the Agreement for the full term of the Agreement. Although Cagin has established he did not take the time off work to which he was entitled, he has not produced any evidence that he was not fully compensated for the time he worked. Cagin's failure to take vacation or other time

off was not done at the Clinic's urging or direction. Instead, this failure occurred because Cagin did not arrange backup and call coverage for himself. Cagin has not established any breach of the Agreement by the Clinic, an essential element of his claim. Although Cagin later became dissatisfied with the deal he struck with the Clinic, or with the compensation he received after the Agreement expired, this dissatisfaction does not constitute a breach of the Agreement. Furthermore, the Agreement contained an integration clause stating that it was the complete agreement between the parties. The parol evidence rule therefore bars introduction of extrinsic evidence to modify the terms of the Agreement. For these reasons, we affirm the district court's order granting summary judgment to the Clinic.

———————————————————