# IN THE SUPREME COURT OF IOWA

No. 09–0325

Filed December 10, 2010

**SENECA WASTE SOLUTIONS, INC.,**

Appellant,

vs.

**SHEAFFER MANUFACTURING CO., LLC**
and **SHEAFFER PEN CORPORATION,**
**A Division of BIC USA INC.,**

Appellees.

On review from the Iowa Court of Appeals.

Appeal from the Iowa District Court for Lee (North) County, Cynthia H. Danielson, Judge.

Contractor appeals from summary judgment ruling dismissing contract action. **COURT OF APPEALS DECISION VACATED; DISTRICT COURT JUDGMENT REVERSED AND REMANDED.**

Brenda L. Myers-Maas, West Des Moines, for appellant.

Benjamin P. Roach of Nyemaster, Goode, West, Hansell & O'Brien, P.C., Des Moines, for appellees.

**HECHT, Justice.**

After hiring a contractor to clean and decontaminate its pen manufacturing plant, the owner of the plant refused to pay more than the "not to exceed" price designated in the cleaning contract. The contractor filed suit, claiming entitlement to a judgment in an amount exceeding the not-to-exceed contract price because the scope of the work defined in the contract was modified by the owner after the written contract was formed. The district court granted summary judgment in favor of the plant owner. On appeal, the court of appeals reversed and remanded. We granted the plant owner's application for further review.

## I. Background Facts and Proceedings.

A reasonable fact finder could find the following facts from the summary judgment record. Sheaffer Manufacturing Company operated a pen manufacturing plant in Fort Madison, Iowa. After deciding to cease operations at that location, Sheaffer took bids from several environmental contractors to clean and decontaminate the plant. Seneca Waste Solutions submitted a letter bid on September 7, 2006. Sheaffer offered the contract to Seneca on a time and materials basis but specifically requested the inclusion of a not-to-exceed price of $170,000. Seneca agreed, and the agreement was finalized in a written "Contractor Agreement." The agreement included the following relevant terms:

> **2. Scope of work.** The Contractor will furnish all of the materials and perform all of the Work as described in the first page of the letter dated September 7, 2006, and sent by Seneca Waste Solutions, LLC to Michele Pancza, BIC Consumer Products Manufacturing Co. Inc, together with the itemized worksheet used to calculate the project cost estimate, which are attached hereto and made a part of this Agreement as Exhibit A.
>
> . . . .

**5. Contract Price and Payments.** The work shall be charged on a Time and Materials Cost Basis at the rates quoted by the Contractor in Exhibit A, except that the Work shall not exceed One Hundred Seventy Thousand Dollars ($170,000.00), inclusive of all taxes, subcontractor fees, and any and all other surcharges, costs and expenses. Sheaffer will pay Contractor upon satisfactory completion of the Work and within forty-five (45) days of receipt of invoice.

. . . .

**12. Complete Agreement.** This Agreement, together with all exhibits attached hereto, constitutes the full and complete understanding and agreement of the parties relating to the subject matter hereof and supersedes all prior or contemporaneous understandings and agreements relating to such subject matter. Any waiver, modification or amendment of any provision of this Agreement shall be effective only if in writing signed by the parties hereto.

The "Exhibit A" referred to in the agreement included the first page of Seneca's September 7 letter bid and a "Budgetary T & M Estimate Worksheet prepared for: Sheaffer Pen Plant Closure" ("worksheet").

The first page of the September 7 letter bid provided, in relevant part, as follows:

Seneca Waste Solutions LLC, is pleased to submit to BIC/Sheaffer Pen this Budgetary T&M estimate for performing decontamination/cleaning/demolition services as per the scope of work specified in the Vendor-Provided Sheaffer Closure/Clean-up Activities Document. The project timeline is estimated at 20 working days. All vacuumed and rinsate residual and decontamination liquids shall be off loaded on site in approved containers. This project shall be performed on a Time and Materials Cost Basis Port-To-Port with an estimated cost based upon projects of similar nature, specified scope of work and onsite pre-estimate inspections. Attached is the itemized worksheet used to calculate the project cost estimate.

Summary of Fees for service:

**Total–does not include Iowa State Sales Tax $143,520.67**

Note: All Seneca Waste Solutions LLC Work is to be completed on a T & M basis. Any materials, supplies or services NOT utilized or performed will NOT be billed.

Please note subcontractor terms, conditions and/or work scope modifications if applicable which will affect the project time and cost.

The "Vendor-Provided Sheaffer Closure/Clean-up Activities" document ("vendor-provided document") referenced in the bid was six pages in length. It included a detailed description of the work to be done and multiple references to the parties' expectation that most of the "rinsate"—washwater collected in the cleaning process—would be transferred to Sheaffer's on-site wastewater treatment facility for treatment and disposal. The contracting parties contemplated that a limited amount of the wastewater (4000 gallons) would be transported off-site and decontaminated by a third party, Heritage Environmental Services. The worksheet prepared by Seneca and referenced in both the letter bid and the written contract is a spreadsheet containing an estimate of the materials and labor needed to complete the cleaning of the facility. The estimate included the sum of $5,186, the cost of the off-site disposal of 4000 gallons by Heritage.

After the contract was executed and about the time Seneca began its work in November 2006, Sheaffer shut down its on-site wastewater treatment facility. Sheaffer directed Seneca to dispose of all wastewater through Heritage. Seneca complied with this directive, but neither Seneca nor Sheaffer requested a written modification to the contract.

On January 5, 2007, as it neared completion of the project, Seneca contacted Michele Pancza, Sheaffer's Environmental Manager, and indicated that it "may be approaching the 'not-to-exceed' price." Pancza communicated this information to other Sheaffer managers in an email message:

I received a call late this afternoon from Seneca indicating they may be approaching the "not-to-exceed" price agreed upon by the contract. They claim the difference is in the

volume of wastewater which they have had to dispose. Obviously, I did not agree to exceeding the contract price and I asked them to keep me informed as work concludes next week.

But, they may have a point. Looking at my original worksheet, I had assumed (as we all discussed) that Sheaffer would be treating much of the wastewaters from power washing, etc, on site in the wastewater treatment unit which would be the last equipment cleaned and dismantled. But, as I understand it, this was the first unit cleaned and then all wastewaters were subsequently sent off site for treatment via pumper truck.

Even though this was not our original plan, dismantling the treatment unit first may not have been a bad idea. If we had treated these additional wastewaters on sight [sic], we very well may have had more and worse exceedances of the NPDES permit limit than the two we already experienced before the shutdown of outfall 001. (And we might be looking at fines or other enforcement actions.) So, though I am not thrilled at the possibility of a higher closure/clean up cost, these potential extra cost [sic] are not so bad when put into perspective.

On January 15, 2007, Seneca's project manager sent an email message to Pancza summarizing the work left to be done and indicating that the work would be completed later that week. He noted that Seneca was "keeping an eye on the total costs of the project as we near our price cap."

Sheaffer paid Seneca $145,980.87 before receiving the final invoice. By the time Seneca completed its work under the contract, Heritage had treated and disposed of more than 18,000 gallons of wastewater, far in excess of the 4000 gallons contemplated in the estimate attached to Seneca's bid. Seneca submitted invoices to Sheaffer totaling $211,599.47. Sheaffer tendered to Seneca payment in the amount of $24,019.13 as the final payment on the contract, an amount that would have brought Sheaffer's total payments under the contract to $170,000. Seneca rejected the tender and filed suit seeking judgment for the full amount of its invoices.

Both parties moved for summary judgment. The district court granted Sheaffer's motion and dismissed Seneca's claim in its entirety, concluding Seneca was bound by the not-to-exceed price included in the contract. The court further concluded there were no written modifications to the contract which would have allowed Seneca to exceed the price cap. The court also rejected Seneca's contract claim for additional payment under the contract because Seneca's answers to interrogatories revealed the contractor's total billings for subcontracted services, including those provided by Heritage, were less than estimated by the contracting parties.

Seneca appealed, and we transferred the case to the court of appeals. The court of appeals reversed the district court, concluding that while the not-to-exceed clause was unambiguous, the summary judgment record—including documents fully integrated into the contract—engendered a genuine issue of material fact as to the amount owed by Sheaffer to Seneca under the contract. We granted Sheaffer's application for further review.

**II. Scope of Review.**

We review a district court's grant of a motion for summary judgment for errors of law. Iowa R. App. P. 6.907. Summary judgment is appropriate

> if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law.

Iowa R. Civ. P. 1.981(3). If reasonable minds can differ on how an issue should be resolved, then a genuine issue of fact exists. *Walderbach v. Archdiocese of Dubuque, Inc.,* 730 N.W.2d 198, 199 (Iowa 2007). A fact is

material "only when its determination might affect the outcome of the suit." *Baratta v. Polk County Health Servs.,* 588 N.W.2d 107, 109 (Iowa 1999). When we review a motion for summary judgment, we must view the evidence in the light most favorable to the nonmoving party. *Id.*

### III. Discussion.

On appeal, Seneca contends the district court erred in two respects. First, Seneca claims the September 7 letter bid, the worksheet, and the vendor-provided document were fully integrated into the contract and that language in these documents entitles Seneca to exceed the not-to-exceed price. Seneca also contends the district court erred by dismissing Seneca's claim in its entirety because even if Seneca was bound to the $170,000 not-to-exceed price, it only received payments totaling $145,980.87 from Sheaffer and is therefore entitled to an additional payment of $24,019.13.

**A. Integration of the September 7 Letter, Worksheet, and Vendor-Provided Document.** Seneca contends the letter bid, the worksheet, and the vendor-provided document are expressly incorporated parts of the integrated agreement. Seneca contends the language in the documents confirms its position that a fact question exists as to whether Seneca is allowed to exceed the not-to-exceed price under the circumstances presented here. Specifically, Seneca points to language in the letter bid which provided that "subcontractor terms, conditions and/or work scope modifications if applicable . . . will affect the project time and cost." Seneca further relies on language within the worksheet providing Heritage's services would be billed to Sheaffer at "cost plus 15% subject to change based on waste analysis and volume." Seneca posits the incorporated documents confirm the parties' agreement that the contract price owed by Sheaffer could exceed

$170,000 if the amount of wastewater sent to Heritage for disposal exceeded 4000 gallons.

Sheaffer contends the bid letter, the worksheet and the vendor-provided document were not integrated in their entirety into the contract. Pointing to language in the contract suggesting only limited portions of the documents are incorporated into the contract, specifically the description of work to be performed contained in the first page of the September 7 letter bid and the worksheet, Sheaffer asserts the clauses discussing the variability of the charges are not included in the portions of the documents expressly incorporated.

Sheaffer further argues that, even if the entirety of the letter bid and the worksheet were incorporated, including the clauses relied on by Seneca to avoid the not-to-exceed price provision, they do not have the effect advocated by Seneca. Sheaffer contends the language relied upon by Seneca is not necessarily at odds with the price cap. Seneca submitted two bids, the first estimating a contract price of $143,520.67 and a revised bid estimating a price of $128,756.72. The agreement adopted a formula for calculating the price clearly expressing the parties' understanding that the amount paid by Sheaffer would vary depending on the amount of time and materials expended by Seneca in completing the work. However, the agreement specifically states that "[t]he work shall be charged on a Time and Materials Cost Basis at the rates quoted by the Contractor in Exhibit A, *except that the Work shall not exceed One Hundred Seventy Thousand Dollars ($170,000.00)*." (Emphasis added.) Even if we assume the language relied upon by Seneca was incorporated in the written agreement, we do not believe it can reasonably be interpreted as an agreement to exceed the price cap. To do so would render the price cap provision superfluous.

Because a contract is to be interpreted as a whole, it is assumed in the first instance that no part of it is superfluous; an interpretation which gives a reasonable, lawful, and effective meaning to all terms is preferred to an interpretation which leaves a part unreasonable, unlawful, or of no effect.

*Iowa Fuel & Minerals, Inc. v. Iowa State Bd. of Regents,* 471 N.W.2d 859, 863 (Iowa 1991). When we interpret the written agreement as a whole, whether or not the additional documents in their entirety are included, we find it clear and unambiguous that the contract must be interpreted in a way giving effect to both the time and materials price formulation and the price cap. Accordingly, we conclude the language of the written contract does not support Seneca's claim based on a contract price in excess of $170,000.

**B. Modification of the Written Contract.** Seneca contends in the alternative that Sheaffer is not entitled to summary judgment because the price cap in the contract applies only to the scope of work described in the written contract. Because the contract clearly contemplated that all of the rinsate collected from the Sheaffer plant, except 4000 gallons of wastewater to be processed off-site by Heritage, would be processed on-site at Sheaffer's wastewater facility, Seneca asserts Sheaffer substantially modified the scope of the work when it closed the facility and directed Seneca to send all of the rinsate to Heritage.

Sheaffer contends it "did not request additional work and did not enter any agreement to pay for extra work." The heart of the disagreement between the parties is the definition of the "scope of the work." Sheaffer broadly characterizes the scope of the work as the "cleaning and decontaminating [of] the facility." While certainly that was the parties' general purpose, the language of the written agreement was

not so generalized. The agreement describes in detail the scope of the work to be done, and it specifically contemplates the disposal of roughly 4000 gallons of 50/50 sludge with Heritage, not the disposal of 18,000 gallons of wastewater, which a fact finder could find was actually treated off-site at Sheaffer's direction.[1]

A reasonable fact finder could find Sheaffer's directive to transport the wastewater off-site for treatment made Seneca's performance substantially more onerous and resulted in a modification of the contract. Although the written contract states that any modifications must be in writing, a written contract may be modified by a subsequent oral contract having the essential elements of a binding contract. *Passehl Estate v. Passehl*, 712 N.W.2d 408, 417 (Iowa 2006); *see also Whalen v. Connelly*, 545 N.W.2d 284, 291 (Iowa 1996). Consent to the modification may be either express or implied from acts or conduct. *Passehl Estate*, 712 N.W.2d at 417. When a party to a contract modifies the scope of the work by requesting "extras" or additional work, the party must pay the fair and reasonable value of the extra work. *DeMuth Landscaping & Design v. Heggestad,* 461 N.W.2d 354, 356 (Iowa Ct. App. 1990) (contract implied from the evidence when contractor hired to landscape north side of lakeshore bank but then requested additional landscaping of south side of bank); *S. Hanson Lumber Co. v. DeMoss,* 253 Iowa 204, 208, 111 N.W.2d 681, 684 (1961) (concluding that agreements made after the execution of a written contract which modify or add to it are valid and enforceable).

---

[1]Sheaffer does not concede that it directed Seneca to transport all of the contaminants to Heritage's facility for treatment and disposal. As this case was adjudicated in the district court at the summary judgment stage, however, we view the record in the light most favorable to Seneca.

Sheaffer attempts to distinguish *DeMuth Landscaping* and *Hanson Lumber* as cases controlling the modification of "fixed price contracts, which are different than time and materials contracts with a maximum price." However, Sheaffer does not explain why the parties to a time and materials contract with a not-to-exceed price should be precluded from orally modifying their contract if they conclude changed circumstances require it.

The written agreement explicitly called for most of the wastewater to be processed on-site at Sheaffer's wastewater treatment facility. While the price provision could be reasonably understood to shift to Seneca the risk of underestimating the amount of wastewater to be processed at Sheaffer's on-site treatment facility, a reasonable fact finder could find the parties' written agreement did not shift the risk that Sheaffer would make Seneca's performance more onerous by directing the processing be undertaken off-site by Heritage at a substantially higher cost. Accordingly, we conclude a genuine issue of fact as to whether the written contract between the parties was modified is engendered in the summary judgment record.

**C. Other Issues.** Sheaffer contends that even if the not-to-exceed price term was modified by the parties, Seneca failed at the summary judgment stage to establish the off-site treatment of an unexpected amount of wastewater was the reason Seneca's charges exceeded $170,000. As we have determined a fact question exists as to whether the parties' written contract was modified, any discussion of whether a breach of contract occurred and the amount of damages, if any, resulting from any breach, is premature at this juncture.

We also note Sheaffer asserted on appeal that the summary judgment ruling dismissing Seneca's claims against codefendant Sheaffer

Pen Company (SPC) should be affirmed on the alternative grounds that SPC was not a party to the contract, SPC did not own or operate the facility in Fort Madison, and SPC did not benefit from the work done by Seneca. Although this issue was raised before the district court, neither the district court nor the court of appeals addressed the issue, and Sheaffer did not reassert the issue in its application for further review. Accordingly, we will not address it.

### IV. Conclusion.

We conclude the district court correctly determined that Seneca was not entitled to more than the $170,000 price cap under the written contract. However, we conclude the district court erred in concluding as a matter of law that the written contract was not orally modified to allow Seneca a contract remedy in excess of $170,000. Because we conclude there is a genuine issue of material fact as to whether the parties modified the written contract, summary judgment was inappropriate. We therefore vacate the decision of the court of appeals, reverse the judgment of the district court, and remand for further proceedings.

**DECISION OF COURT OF APPEALS VACATED; DISTRICT COURT JUDGMENT REVERSED AND REMANDED.**