**S & W AGENCY, INC., d/b/a Farm and City Insurance Services, and Gaylord Wooge, Plaintiffs,**

v.

**FOREMOST INSURANCE COMPANY, Foremost County Mutual Insurance Company, American Federation Insurance Company, and George H. Shattuck, Defendants.**

No. C 92–3071.

United States District Court,
N.D. Iowa,
Central Division.

Jan. 21, 1998.

Chris Sheldrup, Cedar Rapids, IA, Kevin Visser, Paul Gamez, for Plaintiffs.

Clifford Schoenberg, New York, NY, James Snyder, Stephen Holtman, David Hacker, Cedar Rapids, IA, for Defendant.

## *ORDER*

JARVEY, United States Magistrate Judge..

## TABLE OF CONTENTS

BACKGROUND ...................................................................963
CONCLUSIONS OF LAW ..........................................................965
  I. Defendants' Motion for Judgment as a Matter of Law............................965
    A.  Breach of Long Term Partnership Agreement .............................966
        1.  Existence of a Partnership..........................................966
        2.  Existence of a Long–Term "Partnership" Agreement ....................966
          a.  Parole Evidence ...............................................967
          b.  Contract Interpretation.........................................968
          c.  Oral Agreement Superseded by 1992 Agency Agreement...............968
          d.  Lack of Mutuality, Consideration, and Definite Time Period ............968
          e.  Defendants Did Not Breach or Plaintiffs Breached First ...............969
          f.  Statute of Frauds ............................................970
    B.  Breach of the Agreement for the Exclusive Marketing of Associations ..........970
    C.  Breach of Agreement for the Exclusive Marketing of the WIT Endorsement.....971
    D.  Intentional Interference with Contractual Relations ........................972
    E.  Fraudulent Misrepresentation .........................................974
        1.  Long-term Agreement .........................................974
        2.  Exclusive Marketing of the WIT and Other Endorsement s to Manufac-
            turer Associations ............................................974
    F.  Fraudulent Nondisclosure..............................................975
    G.  Misappropriation of Trade Secrets ......................................977
        1.  Existence of a Trade Secret......................................977
        2.  Misappropriation .............................................979
    H.  Damages............................................................980
  II. Motion for New Trial ....................................................980
    A.  Plaintiffs' Exhibit 151.................................................981
    B.  LeMoine's Testimony on Leja's RV Initiative Meeting Notes .................981
    C.  Verdict Against the Weight of the Evidence & Excessive Award ..............983

This matter comes before the court pursuant to plaintiffs' motion to amend the judgment (docket number 101), defendants' December 14, 1995 motion for judgment as a matter of law or for new trial (docket number 102), plaintiffs' motions for attorney fees (docket numbers 103 and 133), defendants' motion to vacate award of costs (docket number 119), and defendants' motion for sanctions (docket number 153). On October 26, 1994, the parties consented to proceed before the undersigned United States Magistrate Judge for any and all proceedings in this case pursuant to 28 U.S.C. § 636(c) (docket number 46). This court heard oral arguments on all of the parties' post trial motions on April 29, 1996. Plaintiffs were represented by Chris Sheldrup, Kevin Visser, and Paul Gamez. Defendants were represented by Clifford Schoenberg, James Snyder, Stephen Holtman, and David Hacker.

## BACKGROUND

This case arises out of the defendants' termination of its agreement with Gaylord Wooge and his Forrest City, Iowa, insurance agency. In the early 1980s Gaylord Wooge conceived an idea for a new insurance product for owners of recreational vehicles and a marketing program for this insurance product. Basically, the product which became known as a WIT or Wooge endorsement provided replacement cost insurance coverage for recreational vehicles. Apparently, due to the safety of recreational vehicle drivers and the otherwise uncommon occurrence of a recreational vehicle being "totaled" for insurance purposes, an insurer could offer replacement cost insurance for recreational vehicles at a very reasonable price.

Another unique feature of Gaylord Wooge's idea related to the marketing of this product. Each of the primary recreational vehicle manufacturers in America sponsor associations which meet at rallies across the country. Wooge's idea was to first convince the association that it should endorse an exclusive marketer of replace-

ment cost insurance to its membership. Wooge would then travel to the rallies, set up a booth, and market the insurance directly to recreational vehicle owners.

Through Wooge's efforts and knowledge concerning recreational vehicle owners, the WIT endorsement became a huge success for Foremost and Wooge as it was marketed through Winnebago's recreational vehicle association. Thus, while Wooge had signed the same insurance agency agreement with Foremost as had other independent agencies, there was no question but that the WIT endorsement created a special relationship between the plaintiffs and the defendants. Because of the plaintiffs' investment of time and money developing the market for the WIT endorsement, the defendants agreed that its relationship with Wooge's agency was more akin to a partnership. In fact, the company used the terms "long-term" and "partnership" to describe this relationship although obviously the term "partnership" was not used to describe the legal entity under which the two parties did business.

Further, the plaintiffs alleged and the jury found that the plaintiff was to be the exclusive marketer of the WIT endorsement to manufacturer associations. In fact, Gaylord Wooge became upset when he found out that representatives of Foremost had approached the Holiday Rambler recreational vehicle association two weeks prior to his attempt to duplicate the Winnebago Association agreement with Holiday Rambler. There was testimony at trial that Foremost recognized this as a violation of Wooge's exclusive right to market to manufacturer associations.

Throughout 1990 and 1991 representatives of Foremost continued to make the same representations to Wooge about being partners for the long-term and Wooge's exclusive right to market the endorsement he developed. Internally, however, the company became concerned about the high commissions that were being paid to Wooge and the fact that he owned rights to the customers' renewal business. At the same time they were telling Wooge about their long-term partnership, Wooge was expending sums of money to develop this business for Foremost and Foremost was planning the cancellation of plaintiffs' agency agreement if Wooge did not accede to a new business arrangement with dramatically lower commissions. In 1992 Wooge's agency was in fact terminated by Foremost and he brought this civil action.

This matter was tried before a jury between November 1, 1995 to November 14, 1995. The jury returned a verdict in favor of the plaintiffs on the following claims: (1) breach of contract by Foremost, (2) intentional interference with plaintiffs' contracts with manufacturer association groups by Foremost and by George Shattuck, (3) fraudulent misrepresentation by Foremost and by George Shattuck,[1] (4) fraudulent nondisclosure by Foremost, and (5) misappropriation of trade secrets[2] by Foremost and by George Shattuck. The jury awarded the plaintiffs six hundred eighty-eight thousand dollars ($688,000.00) in compensatory damages, eight million dollars ($8,000,000.00) in punitive damages against Foremost, and twelve thousand dollars ($12,000.00) in punitive damages against George Shattuck.

---

1. The jury found all three facts were misrepresented. They were the existence of a long-term partnership, the right to exclusively market the "WIT" endorsement, and the right to exclusively market recreational vehicle (RV) insurance to manufacturer associations having contact with plaintiffs. George Shattuck was the individual at Foremost most responsible for dealing with plaintiffs and the termination of plaintiffs' agency.

2. The jury found all three claimed trade secrets to have been misappropriated. They were expiration information concerning plaintiffs' customers, information regarding the underlying agreement, and information regarding the unique characteristics of RV owners and the RV marketplace.

Defendants raise eleven arguments in support of their post trial motions. Defendants argue that Foremost neither breached a contract nor fraudulently misrepresented any facts: (1) that plaintiffs were Farmland's long-term partners, (2) that plaintiffs would have the exclusive right to market associations having contact with plaintiffs, and (3) that plaintiffs would be the exclusive marketer of the "WIT" replacement cost endorsement. In addition, defendants assert that Farmland is entitled to judgment as a matter of law (JML) on plaintiffs' fraudulent nondisclosure claim, trade secrets claim, and intentional interference with contracts with associations. Defendants also argue that neither the compensatory damage award nor the punitive damage award can stand if the court grants their motion on any of the above grounds. Finally, Defendants argue that, should the court deny their motions for JML, they are entitled to a new trial for the various reasons set forth in their brief. Plaintiffs resisted the motions on all grounds.

### CONCLUSIONS OF LAW

#### I. Defendants' Motion for Judgment as a Matter of Law

Fed.R.Civ.P. 50 provides for alternative post-trial motions for JML or new trial. It states the following in relevant part:

(a) Judgment as a Matter of Law.

(1) If during a trial by jury a party has been fully heard on an issue and there is no legally sufficient evidentiary basis for a reasonable jury to find for that party on that issue, the court may determine the issue against that party and may grant a motion for judgment as a matter of law against that party with respect to a claim or defense that cannot under the controlling law be maintained or defeated without a favorable finding on that issue.

(2) Motions for judgment as a matter of law may be made at any time before submission of the case to the jury. Such a motion shall specify the judgment sought and the law and the facts on which the moving party is entitled to the judgment.

(b) Renewal of Motion for Judgment After Trial; Alternative Motion for New Trial. Whenever a motion for a judgment as a matter of law made at the close of all the evidence is denied or for any reason is not granted, the court is deemed to have submitted the action to the jury subject to a later determination of the legal questions raised by the motion. Such a motion may be renewed by service and filing not later than 10 days after entry of judgment. A motion for a new trial under Rule 59 may be joined with a renewal of the motion for judgment as a matter of law, or a new trial may be requested in the alternative....

■ Under *Fed.R.Civ.P.* 50(b), a litigant's post-trial motion for JML on any claim may not be entertained unless the movant previously moved for JML on that claim at the close of all evidence pursuant to *Fed.R.Civ.P.* 50(a). *Century Wrecker Corp. v. E.R. Buske Manuf. Co.*, 913 F.Supp. 1256, 1265 (N.D.Iowa 1996) (citing *Rockport Pharmacy, Inc. v. Digital Simplistics, Inc.*, 53 F.3d 195, 197 (8th Cir. 1995); *Smith v. Ferrel*, 852 F.2d 1074, 1075 (8th Cir.1988); *Hubbard v. White*, 755 F.2d 692, 695 (8th Cir.1985)).

■ If error has been preserved on the issue, then the court must decide whether there is sufficient evidence to support a jury verdict. To do so, the court must analyze the evidence in the light most favorable to the prevailing party and must not engage in a weighing or evaluation of the evidence or consider questions of credibility. *Century Wrecker*, 913 F.Supp. at 1267 (quoting *White v. Pence*, 961 F.2d 776, 779 (8th Cir.1992)). All of the evidence must point one way and be susceptible to no reasonable inference sustaining the position of the nonmoving party. *Pence*, 961 F.2d at 779. Thus, the court must "consider the evidence in the light most favorable to the prevailing par-

ty, assume that the jury resolved all conflicts of evidence in favor of that party, assume as true all facts which the prevailing party's evidence tended to prove, give the prevailing party the benefit of all favorable inferences which may reasonably be drawn from the facts, and deny the motion, if in light of the foregoing, reasonable jurors could differ as to the conclusion that could be drawn from the evidence." *Minneapolis Community Dev. Agency v. Lake Calhoun Assoc.*, 928 F.2d 299, 301 (8th Cir.1991) (quoting *Atlas Pile Driving Co. v. DiCon Fin. Co.*, 886 F.2d 986, 989 (8th Cir.1989)).

## A.   Breach of Long Term Partnership Agreement

### 1.   Existence of a Partnership

For the first time in post-judgment motions, the defendants have seized upon the words that Foremost used to describe its long-term relationship with the plaintiffs and contend that plaintiffs have failed to show that such a relationship existed. That is, Foremost called its relationship with the plaintiffs a long-term "partnership." The defendants now contend that under the law of partnerships, no partnership was legally formed and if it were, it could be dissolved at will.

This hypertechnical legal argument ignores the reality of the facts on which it is based. The defendants never asked the court to have the jury interpret whether the use of the term "partnership" was meant in its 1990s corporate vernacular or in the legal sense that the defendants now claim. It is clear to the court that the defendants described the relationship as a partnership to reflect the contributions of two separate legal entities toward a mutual goal in a very close working relationship. Further, the evidence shows that this relationship existed in that the plaintiffs shared information with the defendants that was not provided under the typical insurance agency agreement. This special relationship was discussed at great lengths

by former Foremost employee Cindy LeMoine in her testimony.

The defendants have not preserved this alleged error. It is entirely a factual dispute for which the defendants did not request an answer from the jury. With respect to this issue, the defendants' motion is denied.

### 2.   Existence of a Long–Term "Partnership" Agreement

Defendants next argue that there was insufficient evidence to prove that there was a long-term agreement. Defendants assert that the at-will provisions in the written contracts govern because the parole evidence rule precludes the use of extrinsic evidence to vary, add to, or subtract from the written contract. Furthermore, defendants argue that even if there were a long-term agreement before 1988 or 1992, it was superseded by the subsequent written contracts. Defendants also argue that there was a lack of mutual assent and insufficient consideration to support a modification and that, even if a long-term agreement existed, it would be too indefinite to be enforceable. Next, defendants argue that if there were such an agreement, it was not breached, or alternatively, plaintiffs' agency agreement with Progressive breached the long-term agreement, thereby excusing defendants' performance. Finally, defendants argue that such a contract would be unenforceable under the statute of frauds.

Plaintiffs argue that the agency agreements did not, and were not intended to, contain all of the agreed upon terms and obligations of the parties. Furthermore, plaintiffs argue that the agency agreements were modified before the termination, that there was testimonial and written evidence of sufficient consideration, and that both parties intended for the duration to be for a reasonably long time, even though the exact number of years was not always reduced to writing. Plaintiffs argue that both parties performed the obligations under the long-term agreement. In addition, plaintiffs ar-

gue that the defendants should be estopped from asserting the statute of frauds to bar enforceability of the modification. Finally, plaintiffs argue that the jury assessed the written contracts, the written documents showing a meeting of the minds regarding a long-term agreement, and the testimony in the record in arriving at a reasonable conclusion that a long-term agreement in fact existed.

### a. Parole Evidence

When an agreement is deemed fully integrated, the parol evidence rule prevents the receipt of any extrinsic evidence to contradict (or even supplement) the terms of the written agreement. *Whalen v. Britt*, 545 N.W.2d 284, 290–91 (Iowa 1996) (citing the Restatement (Second) of Contracts § 213 (1981)).

■ An agreement is fully integrated when the parties involved adopt a writing as the final and complete expression of the agreement. *Whalen,* 545 N.W.2d at 290; *Montgomery Properties Corp. v. Economy Forms Corp.,* 305 N.W.2d 470, 476 (Iowa 1981). Whether or not a written agreement is integrated is a question of fact to be determined by the totality of the evidence. *Whalen,* 545 N.W.2d at 290; *Young v. Cedar County Work Activity Center, Inc.,* 418 N.W.2d 844, 848 (Iowa 1987); Restatement (Second) of Contracts § 209 comment c (1981).

■ The Supreme Court of Iowa has held that the parol evidence rule applies when a "handcrafted contract contains an integration clause, where the parties were sophisticated business persons represented by counsel and of equal bargaining strength, and where terms of the alleged oral agreement reasonably would be expected to be included in the … agreement." *Montgomery,* 305 N.W.2d at 476; *Whalen,* 545 N.W.2d at 291. If the contract is fully integrated, then the parol evidence rule applies to prior and contemporaneous matters. It does not bar evidence of subsequent negotiations to show modification of a written contract. *Whal-*

*en,* 545 N.W.2d at 291 (citing *Baie v. Nordstrom,* 238 Iowa 866, 29 N.W.2d 211, 213 (Iowa 1947)). It also does not bar extrinsic evidence for the purpose of showing that a writing is not an integrated agreement or that a writing is not completely clear and unambiguous as to the subject in dispute, or to aid interpretation if it sheds light on the situation of the parties, antecedent negotiations, the attendant circumstances, and the objects they were striving to achieve. *Kroblin v. RDR Motels, Inc.,* 347 N.W.2d 430, 433 (Iowa 1984); *Hamilton v. Wosepka,* 261 Iowa 299, 154 N.W.2d 164, 168–72 (1967); *Westway Trading Corp. v. River Terminal Corp.,* 314 N.W.2d 398, 402 (Iowa 1982).

■ There was sufficient evidence in the record to enable the jury to conclude that either the agency agreements were not fully integrated or were subsequently modified. Jack Hannigan of Foremost testified that the agency agreement is a standard agency contract—in other words, not handcrafted. The agency agreements contain no integration clause. Furthermore, Jack Hannigan, the highest ranking Vice–President of Foremost to appear live at this trial, and John Leja of Foremost testified that there was an agreement that F & C would be the exclusive marketer of manufacturer associations with whom it had contracts, and John Leja wrote Wooge a letter regarding this arrangement. Thus, the jury could conclude that the agency contract was not integrated and that there were, in fact, other binding oral agreements.

George Shattuck of Foremost and John Leja both testified that Foremost's agreement with the plaintiffs was to be long term and wrote letters to Wooge imparting such an expectation. They testified that they expected Wooge to rely on those letters. Furthermore, Cindy LeMoine, formerly with Foremost at times relevant to these proceedings, testified that the relationship between Foremost and F & C was not a typical insurance company-agency relationship. She stated that

with another [sic] agencies, we just kind of let them do whatever. It wasn't as if you shared any information, you just hoped and prayed sometimes that they gave you some motor home business. Where Gaylord, you actually shared the information, kind of developed marketing strategies and said, this is how we're going to get the business. . . . It's like a two-way street. We all shared. Other agencies, it was like we gave something to them, if they used it, great, if they didn't, fine, we'll work with it."

Thus, the jury could also find that there was an oral agreement for a long-term relationship which constituted either part of the total agreement or a modification of the written agreement.

### b. Contract Interpretation

Defendants next argue that the specific terms of the written agreements must prevail over the general terms of any oral agreement for a long-term contract. In general, when a contract contains both general and specific provisions on a particular issue, the specific provisions are controlling. *Iowa Fuel & Minerals, Inc. v. Iowa State Board of Regents*, 471 N.W.2d 859, 863 (Iowa 1991); *Mopper v. Circle Key Life Ins. Co.*, 172 N.W.2d 118, 126 (Iowa 1969). Furthermore, the contract must be read as a whole and interpreted, if possible, so as to avoid making any provision superfluous. *Iowa Fuel*, 471 N.W.2d at 862; *Fashion Fabrics of Iowa, Inc. v. Retail Investors Corp.*, 266 N.W.2d 22, 26 (Iowa 1978). However, in this case, assessing all of the evidence in the light most favorable to the plaintiff, the jury reasonably could have found that the agency agreements were subsequently modified by oral agreement. Thus, the at-will termination clause would be replaced by the subsequent long-term relationship clause.

### c. Oral Agreement Superseded by 1992 Agency Agreement

Similarly, the jury could have found that the at will termination clause was not intended to limit the long-term agreement for which the plaintiff had provided additional consideration. Assessing all the evidence in the light most favorable to the plaintiff, including the fact that there were no discussions about limiting the duration of the relationship when the 1992 agreement was signed, and the fact that plaintiffs received no additional benefit for the additional consideration of giving up the long-term contract, the jury's conclusion was not unreasonable.

### d. Lack of Mutuality, Consideration, and Definite Time Period

Defendant also contends that there was insufficient evidence in the record to establish a meeting of the minds to create a long-term agreement, consideration to support such an agreement, or definite time period for the contract to be enforceable.

Gaylord Wooge testified regarding the agreement for a long-term commitment and the understanding of the parties as to why that would be important. In addition, Shattuck's letter to Wooge, exhibit 19 stated, "As we discussed, we feel that Farm and City Insurance is a long-term key player within the Foremost Insurance structure. Again, we wish to emphasize our partnership position, as Farm and City can have a major role in the long-range development of the motor home and travel trailer lines." Leja also wrote to Wooge in exhibit 32 stating, "By understanding our direction, you will be able to see that you do have now, and will have in the future, a very valuable role to fill. . . . Independent agents are the largest source of revenue for our recreational vehicle products and will continue to be the largest distribution source into the foreseeable future." In the same letter, Leja discusses the "partnership understanding." Leja stated, "Quite frankly, Gaylord, after last summer's fiasco with a revised contractual arrangement and dissatisfaction between both parties, I have not addressed your need for a long-term commitment. I feel both of us, as well as our organizations, would like a long-term contractual agreement. I will, therefore, start the process again in ear-

nest." Leja concluded by stating, "Gaylord, this letter represents my approach to your agency. It also represents George's, Jack's, and the organization's. I hope it satisfies your needs, and we can proceed in a trusting, partnering fashion." In addition, Shattuck testified that it was his intention that the relationship between Foremost and F & C, at least in 1990, would have been a long-term relationship and indicated that he sent the April 12, 1990 letter with the intention that Mr. Wooge would rely upon the statements and representations that he made. Thus, making all inferences in favor of the plaintiff, reasonable jurors could conclude that there was a meeting of the minds regarding a long-term relationship.

Under Iowa law, a contract for permanent employment that is indefinite as to time of duration, and one in which the employee merely promises to perform services, is terminable at will. *See Kunzman v. Enron Corp.*, 902 F.Supp. 882, 905–06 (N.D.Iowa 1995); *Stauter v. Walnut Grove Prods.*, 188 N.W.2d 305, 311 (Iowa 1971). If the employee offers consideration in addition to services, "a contract for permanent or lifetime employment is valid and enforceable and continues to operate so long as the employer remains in business and has work for the employee once the employee performs competently." *Stauter*, 188 N.W.2d at 311; *see Pine River State Bank v. Mettille*, 333 N.W.2d 622, 627 (Minn.1983). When additional independent consideration is provided, the contract is enforceable even though the promisee has the right to terminate at any time. *See Collins v. Parsons College*, 203 N.W.2d 594, 598 (Iowa 1973). Although the agency contract is not an employment contract, it is sufficiently analogous to the employment arena for the doctrine to be applied.

Wooge testified that in return for this long-term agreement, he would be expending additional money, time, and other resources to reach new associations. He did it not knowing that in February of 1990 Foremost executives were planning to compete with him, complaining internally of Wooge's high commissions and stating, "We have to own the renewals." (Exhibit 39). The jury could find that this was not part of his day-to-day functions as an agent of Foremost, and it was not necessary to continue the agency agreement. The jury's finding that it was additional and was sufficient consideration to support the long-term agreement was reasonable.

Defendants admit that, if sufficient consideration supports the agreement, a definite time period is not necessary. Because there was evidence in the record demonstrating that additional consideration was promised and that plaintiffs had begun to expend the consideration, a definite period of time is not necessary. Thus, the jury reasonably could find that the oral agreement for a long-term agency relationship was enforceable.

### e. Defendants Did Not Breach or Plaintiffs Breached First

Defendants argue that, assuming that there was a long-term agreement, they did not breach it by terminating plaintiffs. Jack Hannigan testified that he terminated the agency because he thought Wooge misrepresented Foremost's approach to others both inside and outside of Foremost. He admitted, though, that he did nothing to verify that his suspicion was true. Furthermore, the jury could have believed Leja's memo to Hannigan stating that Wooge presented himself with a "nuisance factor" and was a hindrance holding "most of the cards" because he owned the business. In such a case, terminating the agency could be found to be a breach of the long-term agreement. The jury's finding was reasonable.

The defendants argue alternatively that plaintiffs breached the agreement first by virtue of their agency agreement with Progressive, thereby excusing performance by Foremost. This argument was not preserved in trial in defendants' motion for

JML. Furthermore, Jack Hannigan testified that F & C's agency agreement with Progressive was not a factor in his terminating the agency contract with Foremost and he stated that entering into agreements with other insurance companies was F & C's right as an independent agent. The only evidence in the record regarding the issue was that the long-term agreement with Foremost would last so long as the majority of F & C's business remained with Foremost. Because the majority of F & C's business remained at all times with Foremost, the jury could have believed that the termination of the agency relationship was a breach of the long-term agreement.

### f. Statute of Frauds

■ The defendants argue that the statute of frauds bars enforcement of the oral long-term contract because it, by its terms, could not be performed within one year. The plaintiffs argue that defendants should be estopped from enforcing the statute of frauds.

Defendants raise this argument for the first time in their post-trial motions. Thus, they have not preserved this issue. Nevertheless, this court will analyze the issue as if it had been preserved.

■ Iowa Code § 622.32 provides:

Except when otherwise specially provided, no evidence of the following enumerated contracts is competent, unless it be in writing and signed by the party charged or by the party's authorized agent:

. . .

4. Those that are not to be performed within one year from the making thereof.

Iowa Code § 622.32(4) (1991). The statute of frauds is a rule of evidence, not of substantive law, and relates to the manner of proof but does not render oral contracts invalid. *Netteland v. Farm Bureau Life Ins. Co.*, 510 N.W.2d 162, 166 (Iowa App. 1993); *Callon v. Callon*, 185 N.W.2d 762, 765 (Iowa 1971). Under the statute of frauds in Iowa, it is well established that a party who partially performs under the agreement may avoid the impact of the statute of frauds and introduce evidence of the oral contract. *Netteland*, 510 N.W.2d at 166 (quoting *In re Lindsey's Estate*, 254 Iowa 699, 118 N.W.2d 598, 605 (1962)); *Gardner v. Gardner*, 454 N.W.2d 361, 363 (Iowa 1990). It has been a long recognized rule in Iowa that any conduct, acts, or circumstances offered to show part performance in order to bring a case within the exception of the statute of frauds must be referable exclusively and unequivocally to the contract. *Davis v. Davis*, 261 Iowa 992, 156 N.W.2d 870, 877 (1968); *Callon*, 185 N.W.2d at 765; *Hawkeye Land Co. v. Iowa Power & Light Co.*, 497 N.W.2d 480, 485 (Ct.App.Iowa 1993).

The true basis of the doctrine of part performance lies in the principles of equitable estoppel and fraud; it would be a fraud upon the plaintiff if the defendant were permitted to escape performance of his part of the oral agreement after he has permitted the plaintiff to perform in reliance upon the agreement. *Davis*, 156 N.W.2d at 877. The jury in this case could have found that F & C had begun expending the extra resources pursuant to the long-term agreement when it was terminated. Thus, the jury reasonably could have concluded that F & C performed under the agreement. The jury could have concluded further that Foremost accepted F & C's part performance, taking the agreement out of the statute of frauds.

### B. Breach of the Agreement for the Exclusive Marketing of Associations

Defendants next argue that there was insufficient evidence in the record to support the jury's finding that Foremost breached the agreement that F & C would have the exclusive right to market to associations which had contact with plaintiffs. Jack Hannigan, John Leja, and Cindy LeMoine testified that such an agreement existed and that they themselves abided by

it. Thus, the jury reasonably could have concluded that there was a meeting of the minds. What the defendants call the "Exclusivity Understanding" demonstrated an intent by Foremost not to interfere with F & C's contracts with other manufacturer clubs. There was sufficient evidence in the record, however, for the jury to conclude that the agreement also encompassed clubs which had contacts with plaintiffs, and that this agreement existed prior to 1990. Steve Field admitted to Wooge that there was a "screw up"—that Foremost should not have marketed to Holiday Rambler. In addition, there was evidence that suggested that Foremost had marketed to Western Recreational Vehicle shortly prior to Western's entering into a contract with F & C. Furthermore, the record supports a finding that Foremost pursued manufacturer associations with whom F & C had contracts as soon as it had terminated F & C's agency contract, including former F & C WIT customers. Finally, Cindy LeMoine testified that her understanding of the agreement was that it regarded contacts, as well. This evidence was sufficient to lead the jury to conclude that Foremost had breached the agreement.

### C. Breach of Agreement for the Exclusive Marketing of the WIT Endorsement

Defendants argue that no agreement that F & C would have the exclusive right to market the WIT replacement cost endorsement ever existed. In addition, defendants argue that, even if such an agreement existed, it was superseded by the "WIT Endorsement Understanding" when plaintiffs sought to use the WIT endorsement on non-WIT accounts. Finally, Foremost argues that it did not breach the agreement because it never marketed the WIT Endorsement.

Plaintiffs argue that the record is replete with evidence supporting the existence of the exclusivity agreement and that the agreement was breached. Furthermore, plaintiffs argue that the WIT refers to both the Winnebago replacement cost endorsement as well as similar endorsements with other manufacturer associations, and that defendants never attempted to distinguish between them before trial. Finally, plaintiffs argue that the "Understanding" did not alter the agreement, but merely was a requirement, which had always applied, for the underwriting of the endorsements.

■ There is extensive evidence in the record to support a jury finding that an exclusivity agreement existed. Cindy LeMoine testified that other agents who were interested in the endorsement were told that the replacement cost endorsement belonged to Wooge. John Robertson admitted that Wooge had been told that he had the exclusive right to use the endorsement and stated that Wooge was consulted when somebody wanted to use the endorsement. Ralph Giles admitted in his deposition that F & C had the exclusive right to market the endorsement. Wooge testified that his understanding regarding marketing other manufacturer-supported clubs was that the same agreement would apply as with the WIT. Thus, the jury's finding that the agreement existed and was enforced by Foremost was reasonable.

Furthermore, the jury reasonably could have concluded that the agreement was breached. Cindy LeMoine testified that she trained American Federation employees about the WIT endorsement. Sarah Gutek and Bob Woudstra admitted that the endorsement which American Federation marketed was exactly the same except that the American Federation package extended the period from three to five years and the price was lower than the WIT endorsement. Finally, the documentary evidence in the record suggests that this package was marketed to manufacturer associations prior to, as well as after, termination of F & C's agency contract. Thus, the jury reasonably determined that the agreement was breached.

#### D. Intentional Interference with Contractual Relations

Defendants argue that, because they did not solicit or contact any associations after plaintiffs entered into contracts with them, there is no evidence of interference with those contracts. Furthermore, they argue that the termination of plaintiffs' agency and their alleged competition did not interfere with any contracts.

■ The Restatement (Second) of Torts § 766 (1977) states the following:

One who intentionally and improperly interferes with the performance of a contract (except a contract to marry) between another and a third person by inducing or otherwise causing the third person not to perform the contract, is subject to liability to the other for pecuniary loss resulting to the other from the failure of the third person to perform the contract.

*Grahek v. Voluntary Hosp. Co-op.*, 473 N.W.2d 31, 35 (Iowa 1991); *Reihmann v. Foerstner*, 375 N.W.2d 677, 683 (Iowa 1985); Iowa Civil Jury Instruction 1200.1. Thus, the plaintiff must show (1) the plaintiff had a valid contract, (2) the defendant knew of the contract, (3) the defendant intentionally and improperly interfered with the contract, (4) the interference caused the contracting parties not to perform the contract with the plaintiff, and (5) the amount of the plaintiff's damages. *Water Dev. Co. v. Bd. of Water Works*, 488 N.W.2d 158, 161 (Iowa 1992) (citing *Nesler v. Fisher & Co.*, 452 N.W.2d 191, 194 (Iowa 1990)); *see also* Iowa Civil Jury Instruction 1200.1; *Rail Intermodal Specialists v. General Elec. Capital*, 103 F.3d 627 (8th Cir.1996).

This tort is not committed by parties to the contract; the tortfeasor must interfere with a contract between another and a third person. *Grahek*, 473 N.W.2d at 35. The tort plainly requires that a third party, who is a party to the underlying contract, be induced or caused to act by the alleged tortfeasor, who must be a stranger to the contract. It does not require that the third party be the agent of the alleged tortfeasor when the third party acts to breach the contract.

■ Iowa law requires that the interference with the contract be both intentional and improper before the alleged interferer can be held liable. *Water Dev. Co.*, 488 N.W.2d at 161; *Grahek*, 473 N.W.2d at 35; *Toney v. Casey's Gen. Stores, Inc.*, 460 N.W.2d 849, 852 (Iowa 1990); *Reihmann*, 375 N.W.2d at 683. In determining what is improper conduct in the context of claims of intentional interference with a contract, Iowa courts have relied on the Restatement (Second) of Torts § 767 (1958), which states the following:

The Restatement provides several tests to determine whether an alleged interference is improper:

In determining whether an actor's conduct in intentionally interfering with a contract or a prospective contractual relation of another is improper or not, consideration is given to the following factors:

(a) the nature of the actor's conduct,

(b) the actor's motive

(c) the interests of the other with which the actor's conduct interferes,

(d) the interests sought to be advanced by the actor,

(e) the social interests in protecting the freedom of action of the actor and the contractual interests of the other,

(f) the proximity or remoteness of the actor's conduct to the interference, and

(g) the relations between the parties.

Comment d to this section explains that:

Intent alone . . . may not be sufficient to make the interference improper, especially when it is supplied by the actor's knowledge that the interference was a necessary consequence of his conduct

rather than by his desire to bring it about. In determining whether the interference is improper, it may become very important to ascertain whether the actor was motivated, in whole or in part, by a desire to interfere with the other's contractual relations. If this was the sole motive, the interference is almost certain to be held improper.... [I]f there is no desire at all to accomplish the interference and it is brought about only as a necessary consequence of the conduct of the actor engaged in for an entirely different purpose, his knowledge of this makes the interference intentional, but the factor of motive carries little weight toward producing a determination that the interference was improper.

Comment J states further:

[I]t has been suggested that the real question is whether the actor's conduct was fair and reasonable under the circumstances. Recognized standards of business ethics and business customs [are pertinent, and consideration is given to concepts of] fair play and whether the defendant's interference is not "sanctioned by the 'rules of the game.'" The determination is whether the actor's interference is "improper" or not.

*Toney,* 460 N.W.2d at 853; *see also Water Dev. Co.,* 488 N.W.2d at 161 (citing the same seven lettered factors from § 767); *Hunter v. Bd. of Trustees of Broadlawns Med. Center,* 481 N.W.2d 510, 518 (Iowa 1992). The court in *Toney,* therefore, concluded that "there must be substantial evidence of a predominant motive on the part of [the alleged tortfeasor] to terminate the [contract] of [the complaining party] for improper reasons." *Id.*

Helen Alne testified that after F & C's agency contract had been terminated, F & C experienced a greater burden and expense in servicing its customers. She testified that, after the termination, ninety percent of her time was spent explaining the cancellation notices, convincing the customers that F & C would take care of their policies and that they could still trust F & C; finding a different insurance company to service the customers; and teaching the insurance company how to work with the customers. Furthermore, she testified that it was difficult to get answers from Foremost regarding the "live" Foremost policies because Foremost would not return their calls or give them timely answers, which caused the customers to become impatient and leave F & C. Exhibit 24 states that Wooge "presents himself with a nuisance factor, ... and he's going to excite and mislead associations as to the value of his program. And it may hinder our own efforts to get these associations."

John Leja admitted that defendants sent solicitation letters to F & C's customers thirty days after the termination and that they sent marketing letters to Winnebago, Holiday Rambler, and Western Recreational Vehicles stating that they recently had decided to terminate their relationship with F & C but would like to continue to provide replacement cost coverage to owners of their units—now for five years rather than three. The evidence suggests further that they were disappointed and considered it a "set back" when they failed in their efforts to compete with F & C for endorsements with manufacturers, through which they had intended to market to the manufacturer association groups. Furthermore, John Leja stated in his internal memo that "a typically long-term and satisfactory relationship between a customer and the agent must be broken.... To do so, the product must be very appealing, both product features and price." John Leja further admitted at trial that the internal memo could indicate that Foremost had considered efforts to try to break the agreement between independent agents and their customers before terminating the agency. All of this evidence together could enable the jury reasonably to determine that Foremost knew that terminating the agency and failing to answer the

questions of F & C would interfere with plaintiffs' performance of its contracts. Foremost intentionally and improperly interfered with the contracts by terminating plaintiffs agency and by competing with plaintiffs.

### E. Fraudulent Misrepresentation

#### 1. Long-term Agreement

Defendants argue that no rational jury could have concluded that Foremost defrauded plaintiffs by representing that plaintiffs were Foremost's long-term partners.

As early as February 9, 1990, the defendants were analyzing F & C's strengths and weaknesses and had set out a "succession plan." Foremost complained internally of Wooge's high commissions and stated, "We have to own the renewals." (Exhibit 39). On April 12, 1990, Shattuck stated in an internal memo, "We will start with a clean slate ...," and on November 19, 1990, Leja described Wooge as a "nuisance factor" who held "all the cards." Furthermore, Leja admitted that he and Shattuck had discussed terminating Wooge as early as 1990, although he testified that it was only a joke. Finally, exhibit 22 suggests that defendants were looking for a way to solicit F & C's insureds post-termination.

On April 9, 1990, however, George Shattuck described F & C as a "long-term key player" who "can have a major role in the long-range development of the motor home and travel trailer lines" and advised F & C to "keep on doing what you are doing." In December of 1990, defendants visited F & C's operations. On May 6, 1991, and again in August of 1991, defendants stated, "We look forward to a continuing strong relationship between our two organizations" and reassured F & C of Foremost's continued commitment to support F & C.

There was extensive evidence in the record that F & C relied to its detriment upon these statements. Furthermore, George Shattuck testified that he intended for F & C to rely upon the April 1990 letter stating that he felt F & C was a long-term player within Foremost's structure and that F & C could have a major role in the long-range development of the motor home and travel trailer lines. He also testified that Wooge was reasonable in relying upon those representations.

The jury reasonably could have concluded that Foremost discussed, internally, terminating F & C's agency and competing with it while at the same time it represented to F & C that F & C was its long-term partner. The jury could have found further that Foremost knew that F & C would rely upon those representations to its detriment and to Foremost's benefit. Thus, the jury's finding that Foremost fraudulently misrepresented that F & C was its long-term partner was supported by substantial evidence.

#### 2. Exclusive Marketing of the WIT and Other Endorsements to Manufacturer Associations

Defendant argues that plaintiffs failed to prove by clear and convincing evidence that Foremost fraudulently represented that plaintiffs had and would continue to have the right to exclusively market RV insurance to associations having contact with plaintiffs. Defendants next argue that plaintiffs failed to prove by clear and convincing evidence that Foremost fraudulently represented that plaintiffs would be the exclusive marketer of the WIT Endorsement. They argue that (1) Foremost never made any representation of such exclusivity, (2) even if they did, Foremost did not know it was false when made and did not intend to deceive plaintiffs, (3) plaintiffs did not rely on the representations, and (4) there was no proximate cause between the representation and plaintiffs' claimed damages.

Plaintiffs argue that Shattuck did, in fact, know of F & C's exclusive right to market the WIT and that F & C was beginning to market it to other manufacturer associations, but that Foremost, nevertheless, intended to market the WIT endorsement directly. Furthermore,

plaintiffs argue that the WIT was used generally to mean replacement cost endorsements, and defendants never made a distinction between the WIT and other such endorsements until the time of trial.

Cindy LeMoine, John Robertson, and Ralph Giles testified that F & C had the exclusive right to market the WIT endorsement and that Foremost had a long history of respecting the agreement by denying all other agents but one the right to market the WIT. Shattuck also testified that he was, at the time of trial, aware that Foremost "had stated repeatedly that Mr. Wooge had the exclusive right to the Wooge–WIT endorsement", and told Wooge in 1990 to "keep on doing what you are doing" regarding marketing the WIT to other manufacturer association groups.

Shattuck testified, however, that "there was a desire of Foremost to market a replacement cost to other association groups." Exhibit 20, an internal memo dated April 12, 1990, states that "we also commonly agree that 1990 will have little impact on any long-range planning—probably not until 1992." This contemporaneous internal memo, thus, could suggest to a reasonable jury that such encouragement was designed in order to buy the defendants time to put into place a direct marketing scheme which included the marketing of an improved "WIT" replacement cost endorsement. Leja testified that in June of 1990, Foremost had made a firm decision to direct market, and that the next step was to go out and get some endorsements. Ultimately, in 1992, F & C's agency was terminated, and American Federation began to market the new, five-year WIT endorsement to Winnebago and attempted to capture other manufacturer endorsements with Holiday Rambler and Western Recreation Vehicle.

These facts are sufficient to enable the jury to conclude that defendants represented to plaintiffs that plaintiffs would be the exclusive marketer of the WIT endorsement to Winnebago and other manufacturer associations, while at the same time, Foremost planned to market an improved WIT directly. Thus, the jury reasonably could have concluded that Foremost made the representations knowing that they were false and intending thereby to deceive the plaintiffs. Based upon the history of Foremost's enforcement of exclusivity, the evidence also would support a finding that plaintiffs reasonably relied upon the representations to their detriment.

## F. Fraudulent Nondisclosure

Defendants argue that there is insufficient evidence in the record to support the jury's verdict on this claim. They argue that an insurer has no duty of disclosure to an independent agent, and no such relationship existed here. The defendants argue further that the preliminary development of a plan is not a material fact, that Foremost did not intend to deceive plaintiffs by not informing them of the plan, and that plaintiffs did not rely on the undisclosed information. Plaintiffs argue that a special relationship existed between plaintiffs and defendants, and that their failure to disclose their intent to compete was a material fact upon which plaintiffs relied to their detriment.

■■■■ A fiduciary relation exists between two persons when one of them is under a duty to act for or to give advice for the benefit of another upon matters within the scope of the relation. *Economy Roofing & Insulating Co. v. Zumaris,* 538 N.W.2d 641, 647 (Iowa 1995) (citing Restatement (Second) of Torts § 874 comment a (1979)); *Dimon v. Cruises by De,* 1994 WL 792663 at *2 (Iowa Dist.Ct.1994); *Irons v. Community State Bank,* 461 N.W.2d 849, 852 (Iowa Ct.App.1990). As the Iowa Supreme Court stated in *Kurth v. Van Horn,* 380 N.W.2d 693, 695–96 (Iowa 1986) (citing Black's Law Dictionary 564 (5th ed.1979)):

> It is a very broad term embracing both technical fiduciary relations and those informal relations which exist wherever one man trusts in or relies upon another.

One founded on trust or confidence reposed by one person in the integrity and fidelity of another. A "fiduciary relation" arises whenever confidence is reposed on one side, and domination and influence result on the other; the relation can be legal, social, domestic, or merely personal. Such relationship exists when there is a reposing of faith, confidence and trust,.and the placing of reliance by one upon the judgment and advice of the other.

See also Economy Roofing, 538 N.W.2d at 647; Irons, 461 N.W.2d at 852; McConnell v. IASD Health Services, 1995 WL 807187 at *6 (Iowa Dist. Nov.17, 1995). Some of the indicia of a fiduciary relationship include the acting of one person for another; the having and exercising of influence over one person by another; the inequality of the parties; and the dependence of one person on another. McConnell, at *6; Economy Roofing, 538 N.W.2d at 647; Irons, 461 N.W.2d at 852.

Circumstances giving rise to a fiduciary duty are so diverse, any such relationship must be evaluated on the facts and circumstances of each individual case. Economy Roofing, 538 N.W.2d at 648. The Iowa Supreme Court recognized that a principal and agent relationship necessarily gives rise to a fiduciary relationship. Kurth, 380 N.W.2d at 698; see also Farmers Grain Co. v. Irving, 401 N.W.2d 596, 601 (Ct. App.Iowa 1986); Cortright v. Pettit, 461 N.W.2d 202, 204 (Ct.App.Iowa 1990). The Kurth court stated further:

A fiduciary relationship imparts a position of peculiar confidence placed by one individual in another. A fiduciary is a person with a duty to act primarily for the benefit of another. A fiduciary is in a position to have and exercise, and does have and exercise influence over another. A fiduciary relationship implies a condition of superiority of one of the parties over the other. Generally, in a fiduciary relationship, the property, interest or authority of the other is placed in the charge of the fiduciary.

Id.

Although F & C is an independent agent, Wooge testified that Foremost was the only RV insurer which F & C offered to customers. Cindy LeMoine testified, as well, that this relationship was different from other independent agents. Thus, F & C's relationship with Foremost on RV insurance could be considered that of a fiduciary relationship under Iowa law. Furthermore, the evidence suggests that F & C placed significant confidence in Foremost to provide the RV insurance, to communicate openly in exchanging marketing information, and not to compete with F & C. Foremost, however, retained the ability to determine when and whether they would underwrite certain risks. Furthermore, the power that F & C had to transfer the book of business was limited; other insurance companies were unable to accept F & C's book because they did not possess Foremost's size and capabilities. This evidence is sufficient to enable a reasonable jury to conclude that a fiduciary relation existed.

The record also contains sufficient evidence that defendants encouraged F & C to continue to invest in the expansion of marketing to manufacturer associations and to share detailed marketing information with Foremost. Cindy LeMoine testified that F & C did expend such resources and shared extensive information on a frequent basis until the agency was terminated. There was also sufficient evidence to enable the jury to infer that Foremost intended to compete, and was preparing programs to enable it to do so, while it intentionally disclosed none of this to F & C prior to mid 1990, and even then continued to conceal the fact that Foremost would actually be competing against F & C. A reasonable jury could find that this nondisclosure was material to the parties' relationship in that plaintiffs would not have expended the resources or shared the information had they known that defen-

dants intended to compete. The jury also could have found that plaintiffs justifiably relied upon defendants' failure to disclose and was damaged thereby.

### G. Misappropriation of Trade Secrets

#### 1. Existence of a Trade Secret

Iowa Code § 550.2(4) defines a trade secret as the following:

> information, including but not limited to a formula, pattern, compilation, program, device, method, technique, or process that is both of the following:
>
> a. Derives independent economic value, actual or potential, from not being generally known to, and not being readily ascertainable by proper means by a person able to obtain economic value from its disclosure or use.
>
> b. Is the subject of efforts that are reasonable under the circumstances to maintain its secrecy.

Iowa Code § 550.2(4); *Economy Roofing*, 538 N.W.2d at 646. Iowa courts construe the definition broadly to include business information.

> Business information may also fall within the definition of a trade secret, including lists and needs, source of supplies, confidential costs, price data and figures.
>
>> Trade secrets can range from customer information, to financial information, to information about manufacturing processes to the composition of products. There is virtually no category of information that cannot, as long as the information is protected from disclosure to the public, constitute a trade secret.
>
> We believe that a broad range of business data and facts which, if kept secret, provide the holder with an economic advantage over competitors or others, qualify as trade secrets.

*US West Communications, Inc. v. Office of Consumer Advocate*, 498 N.W.2d 711, 714 (Iowa 1993) (citations omitted) (concluding that "the lease, sale and purchase information possessed by West and its subsidiaries fits within the term "information" as used in section 550.2(4)"); *Basic Chemicals, Inc. v. Benson*, 251 N.W.2d 220, 230 (Iowa 1977) (applying common law and finding that formula books, "buy books," "cost books," and customer books constituted trade secrets).

■ Whether or not information constitutes a trade secret is a mixed question of law and fact. *Economy Roofing*, 538 N.W.2d at 648. The legal question regards whether the information could constitute one of the types of information listed under § 550.2(4). The fact question regards the two subparts of § 550.2(4).

The Supreme Court of Iowa has interpreted the independent economic value prong of the test as "speak[ing] to the value of the information to either the owner or a competitor; any information which protects the owner's competitive edge or advantage." *US West*, 498 N.W.2d at 714. Thus, "information kept secret that would be useful to a competitor and require cost, time and effort to duplicate is of economic value." *Id.*

■ The subject matter of a trade secret also must be secret. Matters of public knowledge or of general knowledge in an industry cannot be appropriated by one as his secret. *Basic Chemicals*, 251 N.W.2d at 229 (quoting from the Restatement of Torts § 757 comment b). A substantial element of secrecy, therefore, must exist such that there would be difficulty in acquiring the information absent improper means. *Id.* Whether such a degree of secrecy existed in a particular case is a question of fact. *Id.* The Iowa Supreme Court held that the "key to this second element of the trade secrets test is found in the words 'reasonable under the circumstances.'" *205 Corp. v. Brandow*, 517 N.W.2d 548, 551 (Iowa 1994).

■ The jury found that three categories of information constituted trade secrets, namely, marketing information regarding RV owners and the RV mar-

ketplace, information regarding the manufacturer agreement part of the WIT, and expirations. Cindy LeMoine testified that the information which F & C supplied about the RV marketplace was valuable to Foremost and Foremost relied upon it. She stated that this information impacted the rest of the marketplace. The evidence in the record showed that F & C frequently informed Foremost of changes in desires of customers, prices and coverage that the customers preferred or desired and that other companies were offering, how to underwrite and package coverage for RV customers, marketing strategies, and other product issues such as unlimited towing. The evidence showed that F & C gathered this information by attending rallies, talking to RV owners and surveying customers and other RV owners at the rallies. F & C spent up to $10,000.00 per rally and attended up to seventeen rallies per year.

Cindy LeMoine testified that the information which F & C supplied to Foremost would be valuable to other insurance companies in the marketplace, as well. When asked whether the information which Foremost made an effort to keep secret and not out in the marketplace, LeMoine answered that "the marketplace didn't really know that Gaylord had a special endorsement. We had rate charts out there that told about the Foremost product, but never mentioned the Gaylord product. So, yeah, the marketplace didn't know about it." Furthermore, she testified that a person who wanted access to this information at Foremost had to pass through "real tight security. People that didn't belong at Foremost weren't going to get in."

Gaylord Wooge testified that the information which F & C shared with Foremost regarding how F & C had put the replacement cost together was valuable. Cindy LeMoine also testified that, except for F & C's endorsement, a policy with a replacement cost endorsement was unheard of, and still is. Regarding efforts to keep the replacement cost agreement secret, Wooge

stated, "You didn't share that with anybody, how it was structured and why, neither the companies that we dealt with or other agents. You know, they would ask you from time to time, 'What is it you're doing?' 'Well, we're just doing something special.'"

Expirations are also considered to be independently valuable. Defendants' expert, Bruce Foudree, testified that the agent owns the book of business because "the agent has gone out and, through the sweat of his brow or her brow, worked very hard and produced—brought these customers to the company. The agent is thought to be the one who owns that information that can then be used … for marketing purposes or selling." He went on to state that the agent's ownership of the expirations does not prevent the insurance company from approaching an insured under any circumstances, but

> generally, any of the information that the agent brings to the company shouldn't be used or relied upon by the—and is not relied upon, it's normal practice not to rely upon. That would be essential for marketing purposes couldn't be used for marketing, so the type of things would be the list of when all those policies expire and who the policies belong to and what their names and addresses and phone numbers are. That couldn't be used, and, in practice, would not be used by the company to go out and sell insurance to those insureds.

The jury reasonably could have determined that F & C did not keep the information secret from Foremost because it relied upon the promises of Foremost that F & C and Foremost were long-term partners and that F & C would have the exclusive right to market the replacement cost endorsement. When asked why he would share this information with representatives of an insurance company, Wooge stated, "We were partners…. If we had an idea, from the very beginning, we would share it with them. That's part of the partnership we had…. It was

known throughout the industry what we were doing, and it was known that it was exclusive to [F & C]." Testimony in the record further suggests that F & C relied upon Foremost's assurances that it would not use the information to F & C's disadvantage.

Based upon the foregoing evidence, a reasonable jury could have found that the three types of information constituted trade secrets which had independent economic value. The jury could have determined further that plaintiffs kept the information secret to an extent that was reasonable under the circumstances.

### 2. Misappropriation

The Iowa Code defines "misappropriation" as follows:

*"Misappropriation"* means doing any of the following:

a. Acquisition of a trade secret by a person who knows that the trade secret is acquired by improper means.

b. Disclosure or use of a trade secret by a person who uses improper means to acquire the trade secret.

c. disclosure or use of a trade secret by a person who at the time of disclosure or use, knows that the trade secret is derived from or through a person who had utilized improper means to acquire the trade secret.

d. Disclosure or use of a trade secret by a person who at the time of disclosure or use knows that the trade secret is acquired under circumstances giving rise to a duty to maintain its secrecy or limit its use.

e. Disclosure or use of a trade secret by a person who at the time of disclosure or use knows that the trade secret is derived from or through a person who owes a duty to maintain the trade secret's secrecy or limit its use.

f. Disclosure or use of a trade secret by a person who, before a material change in the person's position, knows that the information is a trade secret

and that the trade secret has been acquired by accident or mistake.

Iowa Code § 550.2(3). The Iowa Code defines "improper means" to include "theft, bribery, misrepresentation, breach or inducement of a breach of a duty to maintain secrecy, or espionage, including but not limited to espionage through an electronic device." Iowa Code § 550.2(1).

In addition to the evidence in the record discussed under the misrepresentation sections above, John Leja testified that he went to Wooge's hometown to find out "how he did his business" for the sole purpose of directing Foremost's efforts later on in terms of marketing to RV associations. When asked whether he had ever told Wooge, when he accepted his offer to visit, that the information which he was turning over could possibly be used by Foremost to develop a competitive program, Leja replied, "I do not believe I would have said we're going to develop a competitive program."

When Bruce Foudree was questioned about exhibit 151, he answered in the affirmative that it "appears to deal with a conflict or perhaps the cannibalization that you talked about dealing with writing an AARP program." In that exhibit Foremost acknowledges that "the agent owns the rights to expirations unless we terminate such agent for failure to pay his agent's balance." Exhibit 94, an internal memo from Shipman to Shattuck, stated "with the existence of both letters and billing our defense that our contact with Wooge's expiring policy holders was merely to comply with the statute is practically gone."

Based upon this evidence, a reasonable jury could have inferred that Foremost acquired the information by misrepresenting to F & C that the two companies were partners which needed to share the information, that Foremost would not use the information to compete with F & C, and that it would honor and retain the secrecy of F & C's information. It would also be reasonable for the jury to conclude that F

& C supplied the information in reliance upon Foremost's assurances, but otherwise took reasonable efforts to keep the information secret. Further, a reasonable jury could have found that Foremost used the information so acquired to compete with F & C. Finally, the jury reasonably could have found that F & C was damaged as a result of the defendants' actions.

### H. Damages

The plaintiff presented so many legal theories that, as the instructions were being drafted and debated, the parties and the court worked diligently to simplify the issues to the greatest extent possible. As a result of these efforts, the court was able to submit a set of jury instructions to which there were only a couple of objections. Because the plaintiff intended to argue that the exact same damage flowed from each of the theories of liability alleged by the plaintiffs, the parties agreed [3] that the court could submit one lost profits damage instruction that would cover any and all of the plaintiffs' theories of recovery. Consistent with this agreement, no objection was raised to the use of this one damage instruction. No motions were made or objections stated to differentiate potential damages based on the various claims for relief asserted by the plaintiffs. The defendants cannot now claim error in failing to differentiate damages based on the various claims for relief.

■ With respect to punitive damages, the parties agreed that punitive damages were available under the theories of intentional interference with contractual relations, fraudulent misrepresentation, fraudulent nondisclosure, and misappropriation of trade secrets. The jury awarded punitive damages in the amount of $8 million against Foremost Insurance Company and $12,000 against George Shattuck. However, punitive damages for violation of Iowa's trade secret laws cannot exceed twice the plaintiffs' compensatory damage award.

Because the plaintiffs were allowed to assess punitive damages on any one of plaintiffs' tort theories and because the trade secrets punitive damages measure of damages is different from the others as a matter of law, the general punitive damage award by the jury cannot stand. A new trial on the issue of punitive damages is therefore necessary.

The court will schedule the retrial on the issue of punitive damages to commence at the parties' convenience within the next six months. The jury that heard this case found the plaintiffs' claim for punitive damages to be very compelling. So did this court. Accordingly, the court will start this retrial on the issue of punitive damages on any day in November or December of 1997 that is agreeable to the parties. Because of the retrial, the plaintiffs' claim for attorney fees should be held in abeyance and resolved upon a final appealable judgment. The issue as to whether the court or the jury resolves the punitive damage question for trade secrets shall be briefed and resolved together with the retrial on punitive damages scheduled for the other claims.

Similarly, the court has reviewed the Clerk of Court's taxation of costs. The court finds them appropriate but leaves room for the amendment of this claim following retrial.

### II. Motion for New Trial

■ In contrast to the standard of review for judgment as a matter of law, *Fed.R.Civ.P.* 50 provides the following regarding motions for new trial:

> Whenever a motion for a judgment as a matter of law made at the close of all the evidence is denied or for any reason is not granted, the court is deemed to have submitted the action to the jury subject to a later determination of the legal questions raised by the motion. Such a motion may be renewed by service and

---

3. The court's conferences on instructions were informal and off the record until such time as the parties got an opportunity to make a record prior to closing arguments. The defendants do not dispute the court's account of the agreement but at the hearing on posttrial motions claimed that they did not remember what the agreement was.

filing not later than 10 days after entry of judgment....

*Fed.R.Civ.P.* 50(b). *Fed.R.Civ.P.* 59 provides that the grounds upon which a new trial may be granted are those "for which new trials have heretofore been granted in actions at law in the courts of the United States...." *Fed.R.Civ.P.* 59(a). The *Pence* court observed the following regarding motions for new trials:

> With respect to motions for new trial on the question of whether the verdict is against the weight of the evidence, we have stated: "In determining whether a verdict is against the weight of the evidence, the trial court can rely on its own reading of the evidence—it can 'weigh the evidence, disbelieve witnesses, and grant a new trial even where there is substantial evidence to sustain a verdict.'"

*White v. Pence,* 961 F.2d 776, 780 (8th Cir.1992) (concluding that the district court may grant a new trial on the basis that the verdict is against the weight of the evidence, if the first trial results in a miscarriage of justice). Thus, the correct standard for new trial is the conclusion that the jury's verdict was against the great weight of the evidence, so that granting a new trial would prevent a miscarriage of justice. *See also Century Wrecker Corp.,* 913 F.Supp. at 1268.

### A. Plaintiffs' Exhibit 151

■ Defendants argue that the court erred in admitting exhibit 151 into evidence without redacting the last paragraph. Defendants timely objected to the exhibit on relevancy and Rule 403 grounds. Plaintiffs respond that exhibit 151 was relevant and its probative value outweighed any prejudicial effect. Furthermore, plaintiffs argue that the jury's verdict regarding liability and damages was supported by substantial evidence in the record, and that the jury's verdict would not have differed had the last paragraph been redacted.

The last paragraph states the following: I believe we must be as sensitive and careful in the area as we were during the IA/GA Conversions. The charge that we tortiously interfered with one of our agents expirations is a ready made remedy for punitive damages to be alleged. Further, our agents knowledge that our AARP Program is a direct program also lends itself to the allegation that we would profit from the reduction of commission if an insured switches to our AARP Program. Also could be damaging before a jury so strict compliance with our internal disciplines is a must.

This paragraph does not state any legal conclusions. What it states is that, if a charge of tortious interference with expirations is brought, plaintiffs will certainly seek punitive damages, as well. This suggests to the jury not that punitives should be awarded, but that defendants knew that it was wrongful to interfere with expirations, and that doing so could get them into trouble. Furthermore, it suggests that defendants were doing everything possible to cover themselves in case of future litigation. Such information does not impinge upon the court's domain in instructing the jury as to the law, and it is relevant to the misrepresentation, nondisclosure, and misappropriation of trade secrets claims. Any prejudicial effect is outweighed by its probative value.

### B. LeMoine's Testimony on Leja's RV Initiative Meeting Notes

■ Defendants next argue that Cindy LeMoine's testimony regarding her understanding of Mr. Leja's RV Initiative Meeting Notes should not have been admitted because it inflamed the passions of the jury and prejudiced Foremost. Defendants argue further that the Court erred in not instructing the jury.

The following is the relevant portion of LeMoine's testimony:

> Q. In this internal note, I would like for you to read to the jury and let me— what does the first sentence of this internal Shattuck initiative meeting note state?

Mr. Huppert: Objection. The document speaks for itself.

The Court: Overruled.

A. It says exactly what's on the sheet.

By Mr. Scheldrup:

Q. Would you read it into the record, please?

A. Slowly. "A typically long-term and satisfactory relationship between a customer and agent must be broken."

Q. And does this memo on the next line indicate how that's going to be done?

Mr. Huppert: Objection. No, personal knowledge on the part of this witness.

. . .

The Court: Sustained.

by Mr. Scheldrup:

Q. Would you read into the record what the second line of this internal document states?

A. "To do so, product must be very appealing in both product features and price."

Q. What was your understanding as to what these two internal notes mean based on all the other information that you were able to gather as an employee of Foremost?

Mr. Huppert: Objection. No personal knowledge. The witness cannot place this document at any point in time that she might be familiar with.

The Court: Overruled. Answer the question.

A. To me it looks like the person that wrote these notes realized that the consequences of what Foremost may do if they did pricing for a separate company, that you could break a long-term relationship, that you have to have a better product in order to break that relationship, that somebody understood the consequences of what could happen.

. . .

Q. And let's turn to page 3. Would you read into the record that first statement that's part of this internal document?

A. Okay. It says, "Positioning with customer develops special program for as-

sociation members. And then with agent's direct response and unavailable."

Q. The next point on this memo?

Mr. Huppert: Objection. I'm going to object to Mr. Scheldrup's misleading highlighting in this next statement. It doesn't appear in the same prominence as it does in the original document. Mr. Scheldrup: Your Honor, at this point I would like to publish to the jury the exhibit.

The Court: I think that's the best idea.

. . .

(Side-bar Conference.)

The Court: I guess my concern about this is that it's fairly argumentative when she—when she doesn't know the circumstances under which that particular memo was written, just to have her read it into the record. Now, if she knows something about, you know, the events that were taking place, and it's hard for the jury to get it otherwise, if she understands what, you know, positioning means and things like that as an insurance term because of her position within the company, I'm with you there.

But the rest of it is kind of argumentative, for her—The last answer were he objected I probably should have not—I should have probably sustained his objection because I think for her to interpret, you know, something that really isn't within the bounds of her position, but rather is just her opinion on, you know, what, you know, that someone was coming to the realization of something seems to me to be argumentative.

The witness' testimony interpreting the statement, though it could have been argumentative, was not likely to have inflamed the jury any more than the actual language of the exhibit. Her interpretation was which a lay juror could have drawn, and the document was published to the jury at that time such that the individual

members of the jury could then reach their own conclusions as to what the statement meant. Furthermore, the defendants did not move to strike the testimony upon the court's statement. Finally, in light of the extensive evidence regarding that particular exhibit, as well as the rest of the documentary and testimonial evidence, it is unlikely that the jury placed an inordinate amount of weight upon LeMoine's answer.

### C. Verdict Against the Weight of the Evidence & Excessive Award

On every claim, this court has noted substantial evidence in support of the jury's verdict. Thus, the verdict was not against the weight of the evidence, nor are the damages excessive.

Upon the foregoing,

IT IS ORDERED,

1. Plaintiffs' motion to amend the judgment (docket number 101) as it pertains to punitive damages for trade secrets shall be taken up at the time of the retrial on punitive damages ordered herein. The motion is denied to the extent that the court is requested to revisit theories of recovery, denied to the plaintiffs pursuant to the defendants' motion for judgment as a matter of law.

2. Defendants' motion for judgment as a matter of law and for a new trial (docket number 102) is denied with the exception that the court sets aside the jury's awards of punitive damages and grants a new trial with respect to these claims.

3. Plaintiffs' motions for attorney fees (docket numbers 103 and 133) are denied without prejudice to reassertion upon entry of a final appealable judgment in this matter.